The MADOW COMPANY,
Plaintiff-Appellant,

v.

S.S. LIBERTY EXPORTER (now called
S.S. OCEANIC REX), Transpacific Nav-
igation Co., S.A., Oceanic Overseas Line,
Inc., China Marine Investment Co., Ltd.,
China Overseas Navigation Co., Ltd.,
Defendants,

and

S.S. OCEANIC LONDON, their engines,
boilers, tackle, etc., and Ta Peng Steam-
ship Co., Ltd., Defendants-Appellees.

No. 357, Docket 77–7388.

United States Court of Appeals,
Second Circuit.

Argued Dec. 2, 1977.

Decided Jan. 16, 1978.

Evelyn F. Cohn, New York City (Caspar F. Ewig and Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, of counsel), for plaintiff-appellant.

Vincent J. Barra, New York City (Dougherty, Ryan, Mahoney, Pellegrino, Guiffra & Zambito, New York City, of counsel), for defendants-appellees.

Before MOORE and GURFEIN, Circuit Judges, and BONSAL,* District Judge.

GURFEIN, Circuit Judge:

The Madow Company ("Madow") appeals from a judgment of the United States District Court for the Southern District of New York (Carter, J.), dismissing its claim against the Ta Peng Steamship Co., Ltd. ("Ta Peng") after trial. This suit in admiralty was brought by the plaintiff cargo owner against the last vessel to carry the damaged cargo, the SS "OCEANIC LONDON," and against her owner, Ta Peng. The cargo was a shipment of horseshoes and other tack from Pusan, Korea, consigned to Madow at Boston. The shipment arrived at the Port of Boston in badly damaged condition. The District Court held that since Madow had failed to prove that Ta Peng received the cargo in good condition, Ta Peng was not liable for the damage. Accepting the findings of fact, we reverse the judgment because it incorrectly applied the governing maritime law.

* Honorable Dudley B. Bonsal, U.S. District Judge for the Southern District of New York, sitting by designation.

On December 28, 1972, at Pusan, Korea, the SS "LIBERTY EXPORTER" took on board two shipments consisting of 446 and 497 cartons of horseshoes and other tack consigned to Madow at the Port of Boston. On behalf of the ship's master, two standard bills of lading covering the shipments were issued by the "L" Lines as a common carrier. The "LIBERTY EXPORTER" proceeded to the port of Hong Kong where her mortgage was foreclosed for default. The mortgagee sold the ship to the Waitby Shipping Company ("Waitby"). As a condition of the sale, Waitby accepted the obligation to arrange the delivery of the goods making up the cargo to their respective destinations.

Waitby then negotiated with appellee Ta Peng a "space charter" for the carriage aboard the SS "OCEANIC LONDON" of all the cargo from the "LIBERTY EXPORTER". Under the terms of the charter, Ta Peng provided 300,000 cubic feet[1] aboard the SS "OCEANIC LONDON" for $175,000. This amount equaled the sum of the freight prepaid on the cargo of the SS "LIBERTY EXPORTER" plus the amounts due on a collect basis under the original bills of lading covering the various consignments included in her cargo. Waitby appointed an agent, Hansen & Tidemann, Inc., of New York, to arrange for discharge and delivery of the cargo. The agent was instructed to collect the freight charges due on delivery and to credit them directly to Ta Peng.

It was established that Ta Peng's usual practice when cargo is transshipped from another vessel to one of its ships is to determine the quantity and condition of the cargo being transshipped. After receiving the cargo aboard its ship without survey, in this instance, Ta Peng issued a "Memo Bill of Lading" dated February 19, 1973. It did not prepare new bills of lading for presentation to the consignees, but agreed to deliver the cargo against surrender of the original bills of lading. Contrary to its usual practice, it made no effort to determine the condition of the cargo at Hong Kong.

The "Memo Bill of Lading" described the "ship" as "M.V. LIBERTY EXPORTER/M.V. OCEANIC LONDON." It described the "Port of Loading" as Hong Kong and the "Port of Discharge from Ship"—"To Various Port [sic] in U.S.A. as per list attached on Space Charter Terms." It described the "Shipper" as "Waitby Shipping Corporation c/o Dodwell & Co., Ltd. as Agents." The cargo was "consigned to"— "Hansen and Tidemann, Inc., New York, For Distribution to the Various Consignees as per List Submitted by Dodwell & Co., Ltd., as Agents, Hong Kong." "Total: Said to contain Twenty-Four Thousand Two Hundred and Thirty-Three Packages Only."

The "Memo Bill of Lading" contained the following clause:

> "Received cargoes from 'OCEAN REX' ex 'LIBERTY EXPORTER' on transshipment and space charter basis, said to contain as list attached. The carrier will absorb loading and discharging expenses but not responsible for the contents and conditions of the cargoes. Claims, if any, shall be for a/c of the owner 'LIBERTY EXPORTER' and shall be negotiated with the owner who issued the original bills of lading."

At the time of the transshipment and issuance of this "Memo Bill of Lading" to Waitby, neither the shippers nor the consignees were aware that the cargo was being transshipped from the "LIBERTY EXPORTER" onto another vessel.

The SS "OCEANIC LONDON" arrived in Boston on April 16, 1973. The shipments consigned to Madow were discharged from the "OCEANIC LONDON" on or about April 20, 1973. The trucker sent to pick up the goods at the pier shortly after the vessel's arrival refused to take delivery of the cargo, since the cargo appeared to be wet and in an otherwise damaged condition. Before the trucker took delivery at the pier, a survey was conducted by John Jaffray, an independent surveyor, who concluded that

---

1. This amounted to approximately ⅔ of the cargo capacity of the "OCEANIC LONDON", which has a deadweight tonnage of 10,820 tons. *Lloyd's Register of Ships* 1977–1978.

the shipment was damaged. His tests indicated, among other things, that the carton had been wetted with salt water.

After the survey mentioned, Madow took possession of the cargo under the original bills of lading issued at Pusan.

Ta Peng maintains that a claim for damage lies only against the issuer of the original bill of lading. It defends against liability upon the ground that it had named Waitby as the shipper and had inserted an exculpatory clause in the new "Memo Bill of Lading". It contends that it owes no duty to the consignees of the original bills of lading, including the plaintiff.

A shipper of goods by common carrier makes out a *prima facie* case for recovery for damaged cargo under the Carriage of Goods by Sea Act ("COGSA")[2] by showing delivery of the shipment to the carrier in good condition and damage at outturn. "Once a prima facie case has been established, the burden of proof is on the defendants to establish that the damage was not due to their negligence, or that it was occasioned by one of the 'excepted causes' in Section 1304(2) of COGSA." *See Demsey & Associates, Inc. v. SS "Sea Star"*, 461 F.2d 1009, 1014, 1015 (2d Cir. 1972).

The carrier, upon receipt at Pusan of the cargo consigned to Madow, issued negotiable clean bills of lading. Under COGSA § 3(4), 46 U.S.C. § 1303(4), these clean bills of lading are *prima facie* evidence that the carrier received the shipments in good condition. *Demsey & Associates, Inc. v. SS "Sea Star", supra.* Since no evidence to the contrary was introduced, the District Court properly found that the shipments were in good condition when loaded aboard the SS "LIBERTY EXPORTER" at Pusan.

It is the normal rule that when an initial voyage was begun with a "clean" bill of lading and there are successive carriers, the liability falls upon the last carrier, unless it can prove that it was not negligent, or that it comes within one of the COGSA "excepted causes." § 1304(2). The rule goes back to the common law and is supported by a balancing of the availability to the respective parties of the means for minimizing the risk. Since the carrier that picks up the cargo from another vessel generally has the power to command inspection upon loading, a power which the faraway shipper or consignee does not possess, the risk quite expectably falls on the last carrier. This may be put either in terms of a presumption that the original cleanliness of the cargo continues, *Chicago & Northwestern Ry. Co. v. C. C. Whitnack Produce Co.*, 258 U.S. 369, 372, 42 S.Ct. 328, 66 L.Ed. 665 (1922),[3] or upon the inability of the cargo at that point to protect itself, *cf. Schnell v. The Vallescura*, 293 U.S. 296, 304, 55 S.Ct. 194, 79 L.Ed. 373 (1934), by demanding a new "clean" bill. Thus, the rule has remained constant through the common law, *The Ghazee*, 172 F. 368 (2d Cir. 1909), the Carmack Amendment to the Interstate Commerce Act,[4] *Chicago & Northwestern Ry. Co., supra*, and the Harter Act[5] which preceded COGSA, *The Africa Maru*, 54 F.2d 265 (2d Cir. 1931), *cert. denied, Osaka Shosen Kaisha v. Habicht Braun & Co.*, 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed.2d 945 (1932) (Harter Act not mentioned though applicable). There is no indication that it was altered by COGSA.[6]

In the case of a transshipment, the last carrier rule relieves the shipper of any obligation to prove that the second and succes-

---

**2.** 49 Stat. 1207 (1936), 46 U.S.C. §§ 1300–1315.

**3.** The Supreme Court relied for the common-law rule on *Hutchinson on Carriers* § 1348 (3d ed. 1906):

"The condition and quantity of the goods when they were delivered to the first of the connecting carriers, being shown, the presumption will arise that they continued in that condition down to the time of their delivery to the carrier completing the transportation and making the delivery to the consign-

ee, and that the injury or loss occurred while they were in his possession."

**4.** 34 Stat. 584, 595 (1906), 49 U.S.C. § 20(11, 12).

**5.** 27 Stat. 445 (1893), 46 U.S.C. §§ 190–196.

**6.** The relevant history of the Harter Act and COGSA is recounted in *Nichimen Co. v. M. V. Farland*, 462 F.2d 319, 326–28 (2d Cir. 1972), and also in Gilmore & Black, *The Law of Admiralty* §§ 3–22 to 3–24 (2d ed. 1975).

sive carriers received the shipment in good shipment.

It may be that in a dire emergency, as where the cargo is taken for transshipment from a vessel stranded on a shoal and there is no time to inspect the cargo, the salvaging vessel should be free of the presumption. When there is time to inspect the transshipped cargo, however, the final custodian ought to inspect the cargo, *see Julius Klugman's Sons, Inc. v. Oceanic Steam Nav. Co. Ltd.*, 42 F.2d 461 (S.D.N.Y.1930), or "reject the cargo". *The Idefjord*, 114 F.2d 262, 265 (2d Cir.), *cert. denied*, 311 U.S. 707, 61 S.Ct. 175, 85 L.Ed. 459 (1940). For the original shipper and his consignee have no way to protect themselves from ensuing damage, since they are in no position to request anew a "clean" bill of lading. Nor do they know what passes between the initial common carrier or his assignee and the second carrier, or what precautions have been taken to ensure safe passage.

Madow has shown delivery of the cargo in good condition at Pusan and damage at outturn at the Port of Boston. This proof shifts the burden to Ta Peng for an explanation of the damage, if it is to avoid liability. Instead of taking up this burden, however, Ta Peng simply argues that its contractual arrangements with Waitby relieve it of liability to Madow. It defends upon the ground that its bill of lading named Waitby as "shipper," and that it was within the power of Waitby and Ta Peng to formulate the rules for the Chartering Agreement. Ta Peng contends that under that agreement it owed no duty to the original consignees, including the plaintiff, who held the original negotiable bills of lading. We cannot agree.

In *Nichimen Co. v. M. V. Farland*, 462 F.2d 319, 325–29 (2d Cir. 1972), we held COGSA applicable to what purported to be a private rather than a public carriage. We held that COGSA governed the relations between the charterer-shipper and the owner because, under the terms of the private charter party, it was the bill of lading which "regulate[d] the relations" between the parties. COGSA §§ 1(b) and 5, 46 U.S.C. §§ 1301(b) and 1305. Of course, in *Nichimen* there was no question of transshipment. But the application of COGSA to a bill of lading issued under a private charter party makes it clear that a bill of lading can, nevertheless, control independently under COGSA in spite of a private contract of carriage.

We must, therefore, take the next step and determine whether the bill of lading originally issued by the "L" Lines binds Ta Peng, in spite of its own effort to avoid liability by its subsequent informal charter party and memorandum bill of lading.

With original negotiable bills of lading outstanding, any subsequent carrier of the cargo must load the cargo subject to the burdens of those bills of lading. It is not privity of contract that sets the liability, but the assumption of a burden that is measured by COGSA through the "contract of carriage"—the bill of lading.

This court has held, indeed, that, in the case of a transshipment, when the original bill of lading was a negotiable bill, the succeeding carrier could not by a new arrangement (even with the shipper) eliminate any of the conditions of such bill, for it is "chargeable not only with notice of the existence of outstanding clean negotiable bills, but also with knowledge that such bills might be transferred to innocent parties in the regular course of trade." *The Idefjord, supra*, 114 F.2d at 266.

Moreover, ". . . the Idefjord, by accepting the cargo for carriage, with knowledge of the clean through bills, made the issuer of those bills its agent. It could not then accept the goods under its own conditions, and it was bound *in rem* for right delivery." *Id.* at 267.

Nor do we think that the subsequent carrier can rid itself of the burden assumed simply by converting itself from a common to a private carrier. In those private charter arrangements which are deemed to be outside the reach of COGSA, it is normally the shipper itself which is also the voyage or time charterer. The private arrangements it effects are negotiated. The bargaining power and skill available is deemed

to be equal as between vessel and charterer. Nor is any shipper of only a *portion* of the cargo, as here, generally involved.[7]

Madow's consignor at Pusan committed the goods to a common carrier, and negotiable bills of lading covering the carriage of the goods from Pusan to Boston were issued. No other contract of carriage was anticipated by the shipper, and the bills of lading themselves expressly provided that any transshipping of the goods would be subject to the terms of the bills of lading. Even after transshipping at Hong Kong, the carriage of the goods was completed and the additional freights collected under the *original* bills of lading. At the time of the transshipping and the "space chartering," the shipper of the goods was neither present nor informed of the necessity for taking steps to protect its interests; Waitby, the "shipper" in Ta Peng's space charter, had possession of the goods only as a common carrier and not as an owner. The enumeration of 24,233 packages and the hiring of an agent to deliver the goods and collect the freight against diverse original bills of lading made it quite clear that Waitby was not the "shipper" regardless of the nomenclature adopted by the parties to the transshipment. It was evident that there were actual shippers who had consigned the cargo to consignees in American ports who held the original bills of lading.

The carriers involved in a transshipment of goods such as this one must obviously make some contractual arrangement for sharing the total freights to be realized from delivery of the cargo. We see no reason why such a contract may not include, as this one did, a provision which by right of indemnity shifts the ultimate burden of responsibility for damage of the goods onto one of the carriers. But the contract between the carriers cannot diminish the rights of the holder of the bills of lading against the initial and successive carriers under the original bills of lading. In this case the carriage of the goods continued to be governed by the original bills of lading after the transshipment, and Ta Peng cannot escape its duties to Madow under the bills of lading and COGSA by means of its contract or "space charter" with the initial carrier.

Madow has shown delivery to the initial carrier in good condition and damage at outturn. Ta Peng, the last or delivering carrier, has failed to carry its burden of explanation under COGSA and the last carrier rule. We hold, accordingly, that Ta Peng is liable to Madow for the cargo damage.[8] Since the District Court, in view of its disposition of the matter, did not rule on damages we will remand the case for consideration of that question.

Reversed and remanded for consideration of damages.

7. "The essence of a charter agreement is that the charterer employs the *entire ship* or a substantial portion of it for a particular voyage or a particular period of time from one holding himself out as a public carrier. Gilmore & Black, The Law of Admiralty § 4–1; Carver, Carriage of Goods by Sea 169 (6th ed.); Poor, Charter Parties and Ocean Bills of Lading § 1 (3d ed.)." *Jefferson Chemical Co. v. Grena*, 413 F.2d 864, 867 (5th Cir. 1969). Here the record does not show whether cargo was carried in the unchartered portion of the vessel. In charters for the entire vessel "the bill of lading is a mere receipt as between the parties to the charter," Gilmore & Black, *The Law of Admiralty* § 4–10 (2d ed. 1975); *Ministry of Commerce v. Marine Tankers Corp.*, 194 F.Supp. 161 (S.D.N.Y.1960); yet, even in that case, if the bill of lading is negotiated, the transferee may treat the liability of the carrier as governed by the bill of lading and therefore by COGSA.

8. Though appellant urges us to hold that even if the appellee is considered as a bailee there was a presumption of negligence which, being unrebutted, is sufficient to sustain appellant's burden of proof, *see Commercial Molasses Corp. v. New York Tanker Barge Corp.*, 314 U.S. 104, 110–11, 62 S.Ct. 156, 86 L.Ed. 89 (1941), we do not reach the issue so framed.