ROMAN CREST FOODS, INC., Plaintiff,

v.

S.S. DELTA COLUMBIA EX S.S. SANTA CLARA, her engines, boilers, etc. and Delta Steamship Lines, Inc., Defendants.

No. 81 Civ. 4279 (JES).

United States District Court, S.D. New York.

Oct. 26, 1983.

Donovan, Maloof, Walsh & Kennedy, New York City, for plaintiff; Donald M. Kennedy and Francis J. McCaffrey, New York City, of counsel.

Lilly, Sullivan & Purcell, P.C., New York City, for defendants; Peter A. Junge and Charles E. Schmidt, New York City, of counsel.

OPINION & ORDER

SPRIZZO, District Judge.

Plaintiff, Roman Crest Foods, Inc. ("Roman Crest"), commenced this civil action pursuant to the admiralty and maritime jurisdiction of this Court. 28 U.S.C. § 1333 (1976). Roman Crest sues under the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315 (1976 & Supp. V 1981) ("COGSA"), seeking damages from defendant Delta Steamship Lines, Inc. ("Delta") for the spoilage of sixty pallets [1] of fresh nectarines carried aboard the vessel S.S. Santa Clara from Valpariso, Chile to Philadelphia, Pennsylvania.[2] Delta denies liability.

On December 10, 1980, the fruit was loaded on board the ship, and clean bills of lading were issued by the vessel's master. Exhibits 1, 2 ("Exh.").[3] The voyage lasted

seventeen days, and the vessel encountered only one day of heavy weather. Exhs. A, E, I. The ship arrived at Philadelphia on December 26, 1980 and began to discharge the fruit during the morning of December 27, 1980. Trial Transcript at 90 ("Tr."); Exh. A.

After the fruit was unloaded, it was inspected in a fumigation shed alongside the dock by Roman Crest's surveyor and a United States Department of Agriculture ("USDA") inspector.[4] Tr. at 379, 388–89. The surveyors found a high degree of spoilage in plaintiff's shipments—three percent decay under bill of lading No. 2 with eighty percent of the fruit marketable, and eight percent decay under bill of lading No. 3 with only fifty to sixty-five percent in marketable condition. Tr. at 406–09; Exhs. 4, 5, 7, 8, I.

■ Roman Crest has established its prima facie case under COGSA by showing that clean bills of lading were issued upon receipt of the fruit by the carrier and that the fruit was delivered in a damaged condition. *See* 46 U.S.C. § 1303(4); *Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 32 (2d Cir.1982); *Baby Togs, Inc. v. S.S. American Ming*, 1975 A.M.C. 2012, 2016 (1975); *Demsey & Associates Inc. v. S.S. Sea Star*, 321 F.Supp. 663, 669 (S.D.N.Y. 1970), *aff'd in part and rev'd in part on other grounds*, 461 F.2d 1009 (2d Cir.1972). The burden therefore shifts to the carrier, Delta, to either show that the damage to the fruit arose from one of the enumerated COGSA exceptions, 46 U.S.C. § 1304(2)(a)–

---

**1.** There is a dispute as to how many "packages" were shipped in this case for purposes of the limitation of liability provisions of COGSA. *See* 46 U.S.C. § 1304(5). Defendant argues that each pallet should be considered a package for purposes of the limitation provision; plaintiff, however, contends that each case of fruit constitutes a package under section 1304(5). While the terms and format of the bills of lading in this case tend to support defendant's contention, *see Allied International American Eagle Trading Corp. v. S.S. Yang Ming*, 672 F.2d 1055 (2d Cir.1982), there is no need to reach that issue since the Court has determined that defendant is not liable.

**2.** Delta is the owner of the S.S. Santa Clara, the in rem defendant in this action.

**3.** Numerals refer to exhibits introduced by plaintiff at trial; letters indicate those introduced by defendant.

**4.** Fumigation is required by the USDA. Tr. at 436. It takes place in a heated shed or warehouse alongside a string piece onto which the cargo is unloaded from the ship. The fruit, after being placed on the string piece, is almost immediately taken into the fumigation shed. The temperature inside the shed is maintained at 40°F., the temperature required by the USDA for fumigation. Tr. at 375–77, 381.

(q); *Westway Coffee Corp.*, 675 F.2d at 32, or that it exercised due diligence to prevent the damage, 46 U.S.C. § 1304(1); *Horn v. CIA de Navegacion Fruco*, 404 F.2d 422, 435 (5th Cir.1968), *cert. denied*, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969). Delta argues that it acted with due diligence and that the damage occurred due to an inherent vice in the cargo. *See* 46 U.S.C. §§ 1304(1), (2)(m).

■ At trial, Delta produced various ship's personnel, including the chief mate, chief engineer and refrigeration engineer, as well as various documents, including the vessel's deck log, engine log, refrigeration log and stowage plans.[5] The testimony and documentation established, and the Court so finds, that the fruit was properly stowed to allow for a sufficient flow of cold air, Tr. at 396, 403–04, and that the temperature in the refrigeration compartment was kept at 32° to 34°F. with a pulp temperature ranging from 33.2° to 35°F. throughout the voyage, Tr. at 198, 200–10; Exhs. E, H. It was also established, and the Court finds, that the temperature was raised 1° to 2°F. approximately thirty-six hours before unloading. Tr. at 240. According to the chief engineer, such an increase is commonly effectuated in order to protect fruit from "chill shock" when outside temperatures are cold[6] and to begin bringing the pulp temperature close to the 40°F. required for the fumigation procedure. Tr. at 343, 288–89; Exh. A. The Court accepts this testimony as credible.

Before the fruit was unloaded, Delta's independent surveyor found the pulp temperature of the fruit in the compartment to be 35° to 37°F. Exh. I. In the inspections conducted after the fruit was placed in the fumigation shed, the pulp temperature was measured as 37° to 39°F.[7] Tr. at 379, 389, 424–25; Exhs. 4, 5, I.

Roman Crest's expert at trial, Austin J. McCabe, had worked as an independent surveyor for over fifty years but had no formal training in horticulture or refrigeration. Tr. at 526–31. Mr. McCabe testified that the fruit should have been refrigerated at 31°F. Tr. at 536. However, Delta's expert, Professor Hans Zutter, a professor of horticulture at Temple University, testified that the room and pulp temperatures maintained during the voyage were proper. Professor Zutter further testified that storage of fruit at 31°F. is only desirable when the humidity can be carefully controlled, because otherwise there is a danger of the fruit losing moisture and shrinking. Tr. at 468–69. Professor Zutter also testified that fruit should be carried at 33° to 35°F. on a ship, such as the Santa Clara, which is not equipped with humidity controls. Tr. at 470; *see* Tr. at 187–89.

In addition, Zutter stated that storing the nectarines at 35° to 37°F. or even at 37° to 38°F. would merely shorten the shelf life of the fruit by three to five days, but would not spoil healthy fruit. Tr. at 475–76, 498–99. He testified that in his opinion the fruit was probably damaged because it was "early fruit," i.e., the first fruit of the season, and was probably not yet fully mature, thus making it more susceptible to disease. Tr. at 430–31, 456, 486–87.

The Court finds the testimony of defendant's expert, Professor Zutter, more persuasive than that of plaintiff's expert, and the Court therefore concludes that the fruit was carried at a proper temperature. The Court further finds that the defendant has carried its burden of showing that it acted with due diligence. This conclusion is sup-

---

5. Roman Crest argues that an unfavorable inference should be drawn from Delta's failure to produce one of the ship's temperature recorders. However, the Court declines to draw such an inference and finds that sufficient evidence was presented at trial to enable the Court to determine the temperature in the refrigeration compartment notwithstanding the absence of that document.

6. The outside temperature at the time the fruit was unloaded from the ship was 21°F. Exh. A.

7. It is unclear how long the fruit was inside the shed. It is possible that the surveys were conducted up to two hours after the fruit was moved into the shed. Tr. at 380–81. Such a delay could account for the 2°F. difference between these surveys and those done on board the ship.

ported by the fact that only plaintiff's cargo was extensively damaged. Other fruit carried in the same refrigeration compartment was found to have incurred only zero to one percent spoilage. Exhs. I, L. The conclusion is inescapable that the damage to plaintiff's fruit was caused by an inherent vice in the cargo.

Accordingly, defendant is entitled to judgment. Costs shall be assessed against plaintiff. Each party is to bear its own attorneys' fees.

SO ORDERED.