**DAVID R. WEBB COMPANY, INC., Plaintiff,**

**v.**

**M/V HENRIQUE LEAL, her tackle, boilers, engines, etc., Companhia de Navegacao Maritima Netumar a/k/a Netumar Lines, Defendant.**

No. 88 CIV 5391 (LBS).

United States District Court, S.D. New York.

March 27, 1990.

Chalos, English & Brown, New York City, for plaintiff; Harry A. Gavalas and William M. Cassarini, of counsel.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for defendant; Peter J. Zambito, of counsel.

SAND, District Judge.

This action arises from the transportation by sea of a shipment of Mocitaiba veneer subsequently found to have sustained fresh water damage. Plaintiff moves for summary judgment, or in the alternative for partial summary judgment, on the issues of liability, limitation of liability and damages.

## I. *Background*

A shipment of Mocitaiba veneer was transported from Santos, Brazil to Baltimore, Maryland aboard the vessel Henrique Leal. The veneer was packed in six wood crates by the shipper, plaintiff David R. Webb Company, and these crates were then put inside larger containers by the carrier, defendant Companhia de Navegacao Maritima Netumar a/k/a Netumar Lines. Defendant issued a bill of lading dated January 13, 1988 for the voyage which read in relevant part:

Description of packages and goods
    said to contain (STC)

    06 Wooden Cases Containing:

    14.103,00 square meters of Mocitaiba veneer.
CONTENTS OF PACKAGES ARE SHIPPER'S DECLARATION
    "FREIGHT COLLECT"
    "CLEAN ON BOARD"
    "AS PER CONTRACT No 10/87"
    NET MEASUREMENT: 7,051 M3
    FOB VALUE $98,721.00

**1.** Defendant asserts somewhat cursorily that plaintiff has not presented any evidence that it is the real party in interest in this litigation. Absent evidence to the contrary, the Court is

*See* Baxter Affidavit, Exhibit B. The bottom of the same bill of lading read:

| Freight Payable Basis | Rate | Basis | Freight Charges |
|---|---|---|---|
| 14,040 M3 | 106.00 | M3 | 1,488.24 |
| AD. VALOREM 1% | | | 987.21 |
| BSC 13.5% | | | 334.19 |

| COLLECT $2,809.64 | Prepaid $ |
|---|---|

*Id.* Plaintiff alleges that the shipment of veneer was consigned to and paid for by plaintiff.[1] John A. Baxter II, the treasurer of plaintiff, affirms that plaintiff contracted to purchase the veneer at a price of $12.00 per square meter for a total price of $169,236.00, $98,721.00 of which was to be paid through a Brazilian bank on January 12, 1988 and the balance to be paid upon discharge in Baltimore. Baxter Affidavit ¶ 2 & 3.

The shipment was unloaded in Baltimore on approximately February 2, 1988. A container stuff/strip tally signed by C.R. Hubbard, a Baltimore stevedore, on February 8, 1988 includes the notation: "SANTOS 23, VENEER RECEIVED IN BAD CONDITION END OF CASE OFF CONTENTS MOLDY + WET CASE 1, 2, 6". Gavalas Affidavit, Exhibit A. A second container stuff/strip tally also signed by Mr. Hubbard on the same day reads: "SANTOS 23, VENEER RECEIVED IN BAD CONDITION CASE # 3,4,5 END OF CASES OFF CONTENTS MOLDY + WET". On February 9, 1988 and again on February 19, 1988, the cargo was apparently inspected by a firm called Toplis and Harding, Inc. on behalf of the notify party named in the bill of lading, though neither party offers any documentary evidence of those inspections.

Willard F. Woytowick, of Transit Surveys, a marine surveying and adjusting firm retained by the cargo underwriter, subsequently arranged for a joint survey and inspection. The joint survey was conducted on February 29, 1988 by a surveyor appointed by defendant, a representative of plaintiff, a surveyor appointed by the cargo

prepared to accept the representations of plaintiff's counsel that it retains an interest in the litigation to the extent of the deductible provided for under its marine cargo insurance policy.

underwriter, a personal representative of the cargo underwriter, and two surveyors representing the freight forwarder. While plaintiff maintains that the veneer was jointly found to be "variously wet, stained, warped, moldy and split," defendant suggests that its surveyor noted that the veneer was "damp at the ends and many strips were warped at the ends." It is undisputed that the survey discovered the presence of some fresh water damage to the veneer.

Pursuant to the joint inspection, the parties apparently agreed that the veneer should be transported to plaintiff's warehouse in Edinburgh, Indiana. Plaintiff suggests that this action was designed to segregate the veneer and salvage and process it if possible. Woytowick reports that he conducted another survey at the plaintiff's premises in Edinburgh on March 9, 1988 and that he submitted a report to the cargo underwriter dated June 22, 1988 detailing the findings of both his inspections. George L. Jenkins, a marine surveyor hired by defendant, also prepared a report, dated June 24, 1988, of the February 29, 1988 inspection.

A salvor/appraiser, George M. Ruddy Company, was commissioned by Woytowick to analyze the condition of the veneer and the feasibility of reworking the salvageable portions. Woytowick also asked Ruddy Company to assign a veneer wood expert appraiser to analyze the cargo. Ruddy inspected the veneer on April 12, 1988 along with the veneer wood expert, Nardi International, Inc. A May 3, 1988 letter from the President of Nardi International to Ruddy estimated that the veneer logs would yield a recovery of 80–85% and had an "excellent salvage value." Plaintiff affirms that it conducted a detailed evaluation of the damage itself and concluded that the veneer had suffered a loss in value in excess of 75% of the fair market price in the market for which it was intended.

Plaintiff, Woytowick, and Ruddy indicate that it was then decided to put the veneer on the salvage market, and that after a "conditional and speculative" offer of $43,-000.00 was refused and another offer of

$37,000.00 was received, plaintiff agreed to retain the cargo at a value of $40,000.00. This sum was apparently approved by the appraiser. In an April 21, 1988 letter, Ruddy informed Woytowick that a credit of $40,000 should be taken once the insured's loss had been agreed. Plaintiff commenced this action on August 3, 1988.

## II. *Discussion*

### A. *Liability*

◼ The Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.A.App. § 1303(2) (1975), imposes upon the carrier the duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." In order to establish a prima facie case for recovery for breach of this duty, plaintiff must demonstrate that "the goods were damaged while in the carrier's custody." *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 351 (2d Cir.1981) (quoting *Pan–American Hide Co. v. Nippon Yusen (Kabushiki) Kaisha*, 13 F.2d 871 (S.D.N.Y.1921) (L. Hand, J.)). Such a showing can be made by establishing "delivery of the goods to the carrier ... in good condition, and outturn by the carrier ... in damaged condition." *Vana Trading Co., Inc. v. S.S. "Mette Skou"*, 556 F.2d 100, 104 (2d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977). In this case, defendant disputes both that the goods were delivered in good condition and that they were released damaged. If plaintiff can establish a prima facie case for recovery, the burden then shifts to the carrier to demonstrate that one of the exceptions in 46 U.S.C.A.App. § 1304(2) applies. Defendant's arguments can be interpreted as an effort to invoke the exceptions for damage arising from inherent defect, quality, or vice of the goods, Section 1304(2)(m), and insufficiency of packing, Section 1304(2)(n).

### 1. Prima Facie Case

◼ As evidence that the goods were delivered in good condition, plaintiff offers the bill of lading with the notation "CLEAN ON BOARD", various other documents apparently filled out at the time of delivery which appear not to indicate any

problems with the cargo, and a letter from one of defendant's officers acknowledging that there had not been any objections raised concerning the condition of the cargo at the time of delivery. Like the bill of lading, the additional delivery documents, though in mostly untranslated Spanish, appear to include no suggestion of any problems with the cargo. Moreover, defendant's own Assistant Vice President of its Insurance & Claims Department, C.B. Gornell, does acknowledge in a letter dated March 28, 1989 that "there [did] not appear to have been any objections raised concerning the condition of the cargo at the time of receipt and therefore no correspondence on that subject would exist." Gavalas Affidavit, Exhibit A. A clean bill of lading, as well as the absence of any mention of problems in the other documents, is generally prima facie evidence of delivery in good condition. *Madow Co. v. S.S. Liberty Exporter*, 569 F.2d 1183, 1185 (2d Cir. 1978). Where the shipper seeks to recover for "goods shipped in packages that would have prevented the carrier from observing the damaged condition had it existed when the goods were loaded," however, a clean bill of lading will not suffice to establish liability. *Caemint Food, supra*, at 352. *See also The Niel Maersk*, 91 F.2d 932, 933–34 (2d Cir.), *cert. denied*, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937).

The parties dispute whether the damaged condition of the crates carrying the veneer could have been observed at the time of loading. While defendant points out that the veneer crates were packed into containers, plaintiff counters that it was *defendant* who packed the veneer crates into the containers, that the bill of lading expressly referred to the crates, and that the dis-charge documents clearly indicate that the damaged condition of the cargo was apparent from external inspection.

Plaintiff offers sufficient evidence to establish that the goods were damaged upon release. The container stuff/strip tallies prepared by the Baltimore stevedores on February 8, 1988, approximately six days after arrival, indicate that the veneer was received in bad condition with the end of the crates off [2] and the contents wet and moldy. Any ambiguity as to the condition of the crates themselves at the time of release is resolved by Woytowick's report of the survey and inspection conducted on February 29, 1988. In that report, the crates are described as "in a heavily wetted/stained and or discolored-moldy condition, although now over 3 weeks after arrival, the wood battens/panels appeared dry to the touch. We did find evidence of oxidation in the nails/crate strappings." Woytowick Affidavit, Exhibit A at 3.[3] Even George Jenkins, the surveyor hired by defendant, reports that "the exterior of all six crates was damp and some areas were molded." Jenkins Affidavit, Exhibit A at 2. While defendant raises the possibility that the damage to the cargo occurred between February 2 and February 29, 1988, the date of the first inspection by Woytowick, this seems highly unlikely in light of the evidence before the Court and is precisely the type of speculation and conjecture that should not defeat a motion for summary judgment. *See generally Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

Plaintiff also establishes that the conditions described upon release of the veneer

---

**2.** Defendant disputes the number of crates found with their ends off, pointing to an undated railroad receipt indicating that only two crates were in such a condition. Comments on Woytowick Affidavit, Exhibit 2. The container stuff/strip tallies do not mention how many of the crates had their ends off. The surveyor hired by defendant indicates that three of the crates were missing their ends. Jenkins Affidavit, Exhibit A at 2. Because it is apparent that it was not simply the missing ends which made the crates' condition apparent from external inspection and because at least two crates had missing ends, the Court believes this is not a dispute over material facts.

**3.** Though its admissibility under the hearsay rule would be in doubt, Woytowick's report also includes the account of C.R. Hubbard, the stevedore who prepared the container stuff/strip tallies, of the condition of the crates on February 8, 1988. According to Woytowick, Hubbard indicated that "all cases of the subject consignment containing wood veneer, had ends off, water draining/leaking out, cases wet etc." Woytowick Affidavit, Exhibit A at 3.

would have been noticeable at the time of delivery. Though it is the contents of the "packages" which are described as "CLEAN ON BOARD" on the bill of lading, it also describes the cargo generally as: "Wooden Cases Containing: 14.103.00 square meters of Mocitaiba veneer." When defendant's personnel loaded these crates into the containers or whenever defendant's personnel accepted the crates, they would undoubtedly have noticed their "heavily wetted/stained and or discolored-moldy condition" described at the time of release, not to mention the missing ends.

The contention of defendant's expert that the wetting could have occurred prior to the time the crates were released to the carrier is not supported by any evidence. Woytowick, plaintiff's expert, observes in his report that the other cargo in the containers with the veneer appeared to have outturned without any problems, that there was reportedly no problem with the containers, and that silver nitrate tests performed during the inspection indicated the absence of chlorides. Woytowick concludes from these observations that:

> [the] evidence and conditions sighted would suggest heavy precipitation as the cause, probably while crates were stowed and or stacked at some loading terminal/dock prior to placing/stowing same within the containers. Ocean Carrier probably realized crates sustaining contact with moisture and ends were therefore removed while in the containers to allow the contents to air dry and any moisture to drain.

Woytowick Affidavit, Exhibit A at 7.[4] Defendant's surveyor acknowledges that Woytowick's conclusion is a "possibility," but contends that it is also possible that the wetting occurred prior to the time the crates were delivered to the carrier. Jenkins Affidavit ¶ 4. In light of the fact that no one appears to have noticed any problems at the time of delivery and in the absence of any evidence suggesting that the conditions existed prior to delivery, the Court finds that plaintiff has established a prima facie case that the damage occurred while the cargo was in defendant's care.

This case differs markedly from the cases where the Court of Appeals has found that the shipper failed to establish a prima facie case. In *Caemint Food*, 647 F.2d at 347, for example, the cans in a shipment of corn beef were found with wet stains, corrugation and mold at the time of release. Though the shipper offered a clean bill of lading, there was evidence, and indeed the trial court made an explicit finding, that some of the cans had already developed mold at the time of delivery. The Second Circuit also noted that the canned corn beef was packed in cartons and that even at outturn, "the evidence showed no correlation between the cans affected by mold and damaged cartons." *Id.* at 352–53. Thus, the Second Circuit found that plaintiff had failed to meet its burden of proof. *Id.* at 352. In this case in contrast, there is no evidence that the veneer had any damage whatsoever at the time of loading. Moreover, it is apparent that there was an obvious correlation between the damaged crates and the affected veneer at the time of unloading.

This case more closely resembles *Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.*, 316 F.2d 163 (5th Cir.1963), the case distinguished by the *Caemint* Court. In that case, a shipment of Italian window glass was released with moisture stains. A clean bill of lading attested to the good condition of only the wooden cases containing the glass. Though the Court recognized that a clean bill of lading might not suffice where the internal condition was not adequately revealed by external appearances, the Court found that "the extensive moisture of the kind found on outturn would ... have been revealed through stains and damage to the cases [upon delivery]." *Id.* at 170.

### 2. Defenses

Having found that plaintiff has established prima facie case for recovery, we

---

**4.** It should be noted that the report of defendant's own surveyor, Jenkins, appears to support this conclusion when it indicates that "[i]t was reported to us that it was raining on the day the containers were stuffed in Santos [Brazil]." Jenkins Affidavit, Exhibit A at 3.

must ascertain whether defendant has demonstrated that one of the exceptions in Section 1304(2) applies. Defendant maintains that it has "raised insufficiency of packing and avoidable (sic) condensation ... and plaintiff has introduced no evidence of probative value to refute same." *See* Defendant's Memorandum in Opposition at 9. Defendant misapplies the burden, however, for it is clearly established that where the shipper has demonstrated that the cargo was delivered in good condition, defendant bears the burden of proving either that it acted with due diligence or that one of the exceptions applies. *Madow,* 569 F.2d at 1185; *Roman Crest Foods, Inc. v. S.S. Delta Columbia ex S.S. Santa Clara,* 574 F.Supp. 440, 441–42 (S.D.N.Y. 1983).

### a) Unavoidable Condensation

In support of his argument that unavoidable condensation could have caused the damage, Jenkins, defendant's expert, notes only that "January is summertime in Santos, Brazil and ... the average mean temperature in Baltimore in February, 1988 was in the area of 32/33 degrees F," Jenkins Affidavit ¶ 4, and that "the shipper had to know that the cargo would be moving from a summer-like climate across the equator to a much cooler climate and that condensation was likely." Jenkins Affidavit ¶ 5.[5] Defendant offers no evidence to suggest that condensation would be unavoidable under these conditions or an inherent vice associated with veneer. Indeed, Woytowick's opinion that "veneer as processed would have contained limited existing moisture" is the only evidence before the Court with respect to veneer's tendency to emit condensation. *See* Woytowick Affidavit, Exhibit A at 7. Moreover, as plaintiff points out, the degree of change of climate on the voyage, the implementation of any measures to ventilate the containers, and the general conditions during the trip is information generally within the knowl-

edge or control of defendant. In light of defendant's failure to offer any evidence to suggest that an inherent vice could have been the cause of the damage, the Court finds the simple assertion of this defense is not sufficient to avoid summary judgment.

This case can be contrasted with *Roman Crest Foods,* 574 F.Supp. at 442, where the Court found that the carrier had exercised due diligence in protecting a shipment of fruit and that the damage was caused by an inherent vice of the fruit. The carrier offered as evidence the testimony of the ship's personnel and documentation establishing proper storage of the fruit, the actual pulp temperatures throughout the voyage and at the time of unloading, and the testimony of an expert that the temperatures were proper and that the fruit was probably damaged because it was the first fruit of the season. *Id.* Here, in contrast, defendant and its expert offer only conclusions and do not present enough evidence to even create a factual issue. It is also not apparent to the Court that veneer has an inherent vice analogous to fruit's tendency to spoil.

### b) Insufficient Packaging

With respect to insufficient packing, defendant points out that the veneer was wrapped in plastic sheeting inside the twenty foot crates. Filler veneer strips encircled the crates' perimeters, and plastic/poly covering appeared to have been used to line the crate. Defendant draws the Court's attention to the fact that the liners were "only taped together." Not only does defendant not indicate what steps plaintiff could have taken to better insulate the veneer, it fails to indicate specifically how plaintiff's packaging could be found to have been inadequate. No evidence of industry custom or past experience has been offered. The Court finds that Jenkins' conclusion that the veneers "were not properly packaged and protected against condensation" to be unsupported by any evidence

---

**5.** Jenkins also argues that the stevedores' report that water was draining/leaking out of the crates at the time of unloading supports his conclusion that the wetting occurred after the crates were put in the containers. Jenkins does

not indicate why this would be the case, and it seems rather obvious that any water trapped in the crates at the time of loading into the containers might drain out at when the containers were unloaded.

and pure speculation. *See* Jenkins Affidavit, Exhibit A at 3.

Once again, the cases in which courts have found insufficient packaging are easily distinguishable. For example, in *S.M. Wolff Co. v. The S.S. Exiria and The S.S. Exceller*, 200 F.Supp. 809 (S.D.N.Y.1961), the Court found that a shipment of fig paste which had been contaminated by foreign matter had been packaged insufficiently by the shipper. A joint inspection at the point of delivery determined that the cartons containing the fig paste were split along seams which had been sealed with gum paper tape and that the fig paste was protruding from the cartons. At trial, it was established that some of the packages of fig paste were already split at the sides with their contents protruding at the time of loading, that the bill of lading noted that the cartons were "stained by contents," and that extra precautions were taken by the carrier to prevent further splitting of the cartons. *Id.* at 811. The carrier's expert testified that the weakness of the single strips of tape binding the cartons was the cause of the splitting, that other stronger tapes were available, and that the shipper had issued specifications which were not observed directing that "gummed cloth paper tape" be used. In this case, the unsupported conclusion of defendant's expert that insufficient packing caused the damage to the veneer notwithstanding, there is no evidence to suggest that the packing was insufficient, much less that insufficient packing caused the damage.

## B. *Limitation of liability*

Plaintiff contends that the "FOB VALUE $98,721.00" as it appeared on the bill of lading was actually a "maximum amount" of liability for loss or damage, as contemplated by COGSA, 46 U.S.C.A.App. § 1304(5) (1975), agreed to by the carrier and the shipper.[6] Plaintiff indicates that the fair market value of the veneer at the port of destination was $169,232.52 and argues that because the losses incurred as a result the damage to the veneer exceeded $98,721.00, it can recover the full $98,-721.00. In contrast, defendant maintains that the "FOB VALUE $98,721.00" was actually a fraudulent declaration of the value of the veneer, and as a result, plaintiff should recover nothing at all or the $500 maximum amount "per package lawful money of the United States" provided for in § 1304(5). In the alternative, defendant argues that plaintiff should only recover the $98,721.00 declared value minus the $40,000.00 salvage value.

### 1. Declaration of Value

■ Defendant's contention that "FOB VALUE $98,721.00" was a knowing and fraudulent misstatement in violation of paragraph 3 of § 1304(5) is not supported by the evidence. As defendant itself concedes, a misstatement is fraudulent only when the speaker intends to deceive or mislead, *see Schwartz v. Newsweek, Inc.*, 653 F.Supp. 384, 390 (S.D.N.Y.1986), and there is no evidence in the record to suggest that plaintiff had such an intent. An understatement of the value of the goods by the shipper would serve only to reduce the amount for which the carrier would eventually be liable. Indeed, the only possible motive for such a misstatement would

---

**6.** Section 1304(5) provides in full:

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *provided,* That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.

Neither the carrier nor the ship shall be responsible in any event for loss or damage to or in connection with the transportation of the goods if the nature or value thereof has been knowingly and fraudulently misstated by the shipper in the bill of lading.
46 U.S.C.A.App. § 1304(5) (1975).

be to reduce the amount of an ad valorem freight charge, and in that regard, it has been recognized that:

> [The] argument that the shipper cheats the carrier out of an increased freight rate when he fails to declare the value of a package worth more than $500 is without merit. If the shipper is willing to bear the risk of loss above that sum, he is privileged to ship at the normal rate; he owed the carrier no duty to declare the value and pay a higher rate.

*Pan–Am Trade & Credit Corp. v. The Campfire*, 156 F.2d 603, 605 (2d Cir.), *cert. denied*, 329 U.S. 774, 67 S.Ct. 194, 91 L.Ed. 666 (1946). *See also Petition of Isbrandtsen Co., Inc.*, 201 F.2d 281, 285 (2d Cir.1953) (fact that the value agreed upon was only a fraction of the actual value of the commodity does not by itself invalidate limitation clause).

The Court also finds no merit to the argument that appears in one of defendant's affidavits [7] to the effect that the "FOB VALUE $98,721.00" was not intended by the parties to "declare" the nature and value of the cargo under paragraph 1 of Section 1304(5) to exempt this transaction from the $500 default figure. Thomas Battaglia, defendant's Vice President of Traffic and Sales, affirms that the declaration of a FOB value in the bill of lading was for the purpose of calculating the "straight freight rate," a 1% ad valorem surcharge which apparently left the carrier liable for no amount in excess of $500 per package, and was not intended to obtain a "true ad valorem or excess value bill of lading." Battaglia Affidavit ¶ 2 & 3. According to Rule 12(b) of defendant's own tariff, if a shipper wanted to obtain an excess value bill of lading and thereby expose the carrier to liability in excess of $500 per package, it would have to "so stipulate in carrier's bill of lading" and pay an additional charge of 8% on the excess value declared over $500 per package.

Battaglia contends that despite the use of the words "ad valorem" to describe the rate charged on the bill of lading, it was simply a straight freight rate.

A civil court of the City of New York has already considered the impact of the terms of this defendant's tariff on a declaration virtually identical to the one in this case on bill of lading prepared by defendant. In *Atlantic Mut. Ins. Co. v. Companhia de Navegacao Maritima Netumar*, 113 Misc.2d 516, 449 N.Y.S.2d 588 (Civ.Ct.1982), *aff'd*, 120 Misc.2d 667, 467 N.Y.S.2d 497 (1st Dep't 1983), the court determined that a declaration "FOB US $80,859.38" on defendant's bill of lading for a shipment of lime oil was sufficient to render defendant liable for more than $500 per package, even though it was not clear that the shipper had paid the additional 8%. After noting that exculpatory terms of tariffs should be construed narrowly and that tariff provisions are unenforceable absent actual notice, the Court refused to give effect to Rule 12(b) of defendant's tariff. *Id.*, 449 N.Y.S.2d at 592. In this case, as in *Atlantic Mutual*, there is no evidence that plaintiff had any type of notice of the tariff provisions; in fact, defendant does not even argue that plaintiff had any opportunity to learn of the provisions. Because the language of Section 1304(5) requires only that "the nature and value of such goods" be declared by the shipper, the Court has also some doubt as to whether the further qualifications for the required declaration which appear in defendant's tariff can be reconciled with the COGSA as a general matter.[8] Finally, in light of *Atlantic Mutual*, defendant can hardly argue that it was unaware of the potential consequences of a declaration like "FOB VALUE $80,859.28" by plaintiff on the bill of lading.

### 2. Pro Rating the Declared Value

By the terms of paragraph 1 of Section 1304(5), if the shipper does not de-

---

**7.** *See* Battaglia Affidavit. This argument does not appear in defendant's brief.

**8.** *See* 46 U.S.C.A.App. § 1303(8) (1975) ("Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect.")

clare the value in the bill of lading, the carrier cannot be held liable in an amount exceeding $500 per package. The $500 therefore is a maximum amount. Paragraph 2 of Section 1304(5) provides that the shipper and carrier can fix another greater maximum amount. Defendant appears to argue that even if "FOB VALUE $98,721.00" constituted a declaration of value as contemplated by paragraph 1, it was not a maximum amount as understood in paragraph two. Defendant concludes that plaintiff should be bound by its representation that the value of the veneer was $98,-721.00 and that that sum should be discounted by the $40,000 salvage amount plaintiff was able to garner.

Subtracting the $40,000 salvage value from the $98,721.00 declared value in order to calculate damages, as defendant suggests the Court should do, would be inconsistent with the practice associated with the type of limitation clauses contemplated by COGSA. While "value" is generally understood as "the worth of any object or property," *see* Black's Law Dictionary 1721 (4th Ed.1969), plaintiff's declaration of "FOB VALUE $98.721.00" in the context of COGSA had a more specific meaning. As has been recognized, the provisions of Section 1304(5) contemplate limitation agreements, not measures of liability. *Pan–Am Trade & Credit Corp. v. The Campfire*, 64 F.Supp. 179, 181–82 (S.D.N.Y.1945), *aff'd*, 156 F.2d 603 (2d Cir.1946), *cert. denied*, 329 U.S. 774, 67 S.Ct. 194, 91 L.Ed. 666 (1946) (quoting *The Steel Inventor*, 35 F.Supp. 986, 998 (D.Md.1940)). *See also Federal Ins. Co. v. Transconex, Inc.*, 430 F.Supp. 290, 295 (D.P.R.1976) (stipulations on a bill of lading designed to limit the amount of the carrier's liability pursuant to COGSA generally known as "agreed-valuation clauses" or "true limitation agreements"). A true limitation agreement, as defined by the Supreme Court, is one which:

> recites that a sum named in the bill of lading is the agreed value of the goods, or their value per unit or per package, in the absence of the shipper's declaration of a higher value; that the rate is fixed with reference to the specified value, and

if a greater be declared a higher rate will apply; that in consideration of the rate to be charged, the carrier's liability for loss or damage shall be limited to the stipulated value. In case of loss or damage, this clause ensures to the carrier's but not to the shippers benefit. The latter can in no event recover more than his actual loss, but may have to take much less. *The damages are computed in the usual way without reference to the stipulation,* but if when so computed they exceed the agreed limit of value, no recovery of the excess may be had.

*The Ansaldo San Giorgio I v. Rheinstrom Bros. Co.*, 294 U.S. 494, 496–97, 55 S.Ct. 483, 484, 79 L.Ed. 1016 (1935). *See also Cutten v. Allied Van Lines, Inc.*, 349 F.Supp. 907 (C.D.Ca.1972), *aff'd*, 514 F.2d 1196 (9th Cir.1975). The parties in this case have done precisely what the Supreme Court describes as conduct consistent with the formation of a true limitation agreement. Plaintiff's declaration of a value greater than $500 for the veneer was a sum named in the bill of lading as the agreed value of the goods. Therefore, the maximum amount for which defendant could be liable was $98,721.00. Plaintiff is entitled to either the $98,721.00 maximum or it's actual losses, whichever is less.

Defendant appears to argue that the insertion of "FOB VALUE $98,471.00" onto the bill of lading converted it into a valuation clause. A valuation clause is a clause inserted into the bill of lading, generally by the carrier, which states a basis for determining the actual value of a commodity in the event of loss or damage. The *San Giorgio I* Court compared a true limitation agreement with a true valuation clause, suggesting that the latter might provide, for example, that "in the event of loss or damage for which the carrier is liable, the same shall be computed on the basis of the value of the goods at the place and time of shipment." 294 U.S. at 497, 55 S.Ct. at 485. The distinction is clearly illustrated by *The Bill*, 55 F.Supp. 780 (D.Md.1944), where the carrier inserted a clause into the bill of lading which read: "... [I]n the event of claims for short delivery when the

Ship reaches her destination, price shall be the market price at the port of destination on the day of [arrival]." The shipper argued that this provision overrode the $500 limitation in Section 1304(5), implying that it constituted a declaration of value, but the Court found that the clause was a valuation clause, not a "specific valuation of the [commodity]." *Id.* at 783. The Court concluded that the clause was not a limitation clause and could not override the requirements of the limitation clause in the COGSA. *Id.*

While it is conceivable that "FOB VALUE $98,721.00," even though not inserted by the carrier and not in the form of a standard valuation clause, could have been intended to be a basis for determining the value of a commodity in the event of loss or damage, the Court does not believe this provides a sufficient basis for denying plaintiff's motion for partial summary judgment. Although the specificity with which the actual amount is stated indeed reflects a specific value, plaintiff demonstrates that the sum did not reflect the market value of the goods at the point of destination, but was in fact the amount paid through a Brazilian bank prior to the voyage. That plaintiff would want to guarantee that defendant was liable for damages up to that amount is therefore entirely understandable.

The Court also assumes that the parties were aware that a clause stating a basis for determining damages other than the value of the goods at the point of destination might not even be enforceable.[9] The Court further assumes that the parties were aware of the requirement of COGSA Section 1304(5) that the shipper declare the amount and value of the goods to avoid the $500 maximum per package and that the parties are expressly permitted to set another maximum amount. Furthermore, while defendant has pointed to its tariff as evidence of the parties' intent, it has offered no evidence to suggest that the declaration was intended to establish a basis for determining the actual amount of damages in the event of loss or damage.[10] Finally, the Court notes that the bills of lading are contracts of adhesion, and any ambiguities "are strictly construed against the carrier." *Allied Chemical Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482 (2d Cir.1985), *cert. denied,*

**9.** *See Otis McAllister & Co. v. Skibs*, 260 F.2d 181 (9th Cir.1958), *cert. denied*, 359 U.S. 915, 79 S.Ct. 584, 3 L.Ed.2d 576 (1959) (holding that provision in bill of lading which lessens the liability of the carrier below that based upon destination value is "null and void and of no effect," because COGSA restored the basis for recovery to what it was under common law); *Holden v. Kendall Fish*, 395 F.2d 910, 912–913 (5th Cir. 1968) (Because COGSA seeks the economic reality of the loss rather than the contractual bargain, parties not free to contract future valuation for lost or damaged goods); *but see Norwich Pharmacal Co. v. S.S. Bayamon*, 474 F.Supp. 240, 242–43 (S.D.N.Y.1979), *aff'd*, 622 F.2d 572 (2d Cir.1980) (clause wherein parties agreed to a valuation for the purposes of damages of $.50 per lb. was enforceable because clause was not printed boilerplate provision, was bargained for and chosen by the shipper, and COGSA applied only because it was incorporated into the contract).

**10.** Had the carrier truly intended an adjustment of the loss or damage pro rata on the basis of the declared value, it might have included the appropriate clause in its bill of lading. For example, in *Petition of Isbrandtsen*, 201 F.2d at 283–84 n. 1, the liability limitation in the bill of lading read in relevant part:

In case of any loss or damage to or in connection with goods exceeding in actual value $500 lawful money of the United States, per package, or, in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, ... unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the Carrier and inserted in this bill of lading and extra freight paid if required and in such case if the actual value of the goods per package or per customary freight unit shall exceed such declared value, the value shall nevertheless be deemed to be the declared value and the Carrier's liability, if any, shall not exceed the declared value and *any partial loss or damage shall be adjusted pro rata on the basis of such declared value.*
(emphasis). The Court expresses no opinion as to whether such a clause would be permissible under COGSA. *See Pan–Am Trade*, 156 F.2d at 604–605 (to give effect to a clause which provides for prorating in case of partial loss by carrier of package to which COGSA ascribes a value of $500 would "'lessen' the carrier's liability in a manner not authorized by any provision of [COGSA]").

475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986).[11]

Defendant cites *San Giorgio I* for the proposition that courts estop a shipper or consignee from claiming at a later time that the value of goods is higher than the sum declared in the bill of lading. Even if the parties had intended the declaration to be a means of determining actual damages, however, defendant misreads *San Giorgio I.* The language cited by defendant reads: "The agreement as to value, in consideration of carriage at the lower rate thus obtained, is held to estop the shipper from demanding damages *in excess of the agreed value.*" 294 U.S. at 497, 55 S.Ct. at 485. Plaintiff is not seeking damages in excess of the agreed value, but rather concedes that its damages are limited to the declared amount. The other case cited by defendant, *Rhobbe, Inc. v. M/V "CARIB TRADER"*, 1986 A.M.C. 2495, 1985 WL 132 (S.D.Fla.1985), is similarly misapplied. In *CARIB TRADER*, after representing the value of the cargo to be $30,000 on a Shipper's Export Declaration, plaintiff sought $159,761.58 in damages, claiming that the declaration had been a clerical error. The Court, after a trial, concluded that the $30,000 figure was the more credible and consistent figure. Here, in contrast, plaintiff claims that its declaration set a correct maximum amount for defendant's liability and seeks only to recover that amount.

## C. *Amount of Damages*

■ In order to establish that plaintiff should collect damages in an amount less than $98,721.00, there must be evidence that plaintiff's actual losses could conceivably have been less than that amount. Because we find that there are genuine issues of material fact concerning plaintiff's effort to mitigate its losses and that the applicability of the figure $98,721.00 rests on the resolution of these issues, defendant's motion for summary judgment with respect to the amount of damages is denied.

Plaintiff agreed to retain the cargo at a value of $40,000.00, approximately 23% of the apparent invoice value of the cargo. The May 3, 1988 letter from Bernard N. Hochberg, President of Nardi International, Inc., the wood expert hired by Ruddy, indicates that at Ruddy's request Hochberg inspected the crates of veneer to estimate damage. The damages estimates were as follows: Crate #1 none; Crate #2 3–5%; Crate #3 12–15%; Crate #4 10–12%; Crate #5 20–25%; Crate #6 20%. Hochberg's letter concludes:

It is my opinion all of these logs are all salvageable by clipping away the excessively water stained and molded ends. The quality of the logs are excellent and will yield a recovery in quantity of 80–85%. Although values per square meter will be reduced due to shorter lengths and limitation of applicability to panels, I would place an excellent salvage value on these six crates.

Zambito Affidavit, Exhibit 4. While it is not entirely clear what these percentages refer to, there is clearly some tension between the salvage price of 23% salvage paid by the shipper itself and an estimate reported at least three weeks after the salvage arrangement had been concluded that the logs were 80–85% recoverable and had "an excellent salvage value." Plaintiff draws the Court's attention to the wood expert's observation that the logs would have to be reduced to a shorter length, but this alone does not appear sufficient to explain the variance.

There is also a limited basis for challenging the figure plaintiff presents as the invoice value of the veneer. The invoice offered by plaintiff indicates a price for the veneer of "US$168,900.00," while a Statement of Claim submitted to Affiliated FM Insurance Company by plaintiff suggests that the invoice value was $169,232.52. *Compare* Baxter Affidavit, Exhibit A *with* Comments on Baxter Affidavit, Exhibit 1. While there may be a simple explanation for the discrepancy between the two figures, plaintiff does not offer one.

---

**11.** *See also Travelers Indem. Co. v. M.S. Kiso Maru,* 471 F.Supp. 898, 902–03 (S.D.N.Y.1979) (ambiguity in phrase "DECLARED VALUE Y9,019,50.–" was not sufficient to avert summary judgment on issue of whether shipper had requested additional ad valorem coverage).

Finally, there is some indication that the condition of the veneer might have deteriorated in the three weeks between when it was unloaded in Baltimore and when it was first inspected by Woytowick. At least two of these weeks were no longer time for which the carrier could be held responsible. The February 9, 1988 inspection by Toplis and Harding, Inc. apparently found that "although the veneer was damp, there was no odor or mold present." Comments on Woytowick Affidavit at 1. By the February 29, 1988 inspection, Woytowick reports that the "[e]nds of the veneer strips appeared in many instances when cursorily examined to show signs of wetness, some wet to the touch, damp mold growth, some pieces starting to warp." Woytowick Affidavit, Exhibit A at 3. Woytowick also reports that "[a]t the time of receipt of [his] assignment, the vessel had arrived and discharged approximately 3 weeks earlier, and therefore reason/cause for the delay in reporting was also to be researched/investigated, as well as any potential/possible enhancement of already existing damages." *Id.* at 2. The results of this research or investigation are not presently before the Court.

In light of these unresolved issues, the Court is not prepared to conclude that plaintiff is entitled to $98,721.00 as a matter of law.

### III. *Conclusion*

Plaintiff's motion for summary judgment is granted insofar as it seeks judgment with respect to liability and limitation of liability. Plaintiff's motion is denied with respect to the amount of damages to which plaintiff is entitled because there remain unresolved issues of material fact, though in no event may plaintiff recover more than $98,721.00. The parties are to provide a letter indicating the status of this case by April 18, 1990.

SO ORDERED.