DELPHI–DELCO ELECTRONICS SYSTEMS and Delphi Energy and Engine Management Systems, divisions of Delphi Automotive Systems, LLC, Plaintiffs,

v.

M/V NEDLLOYD EUROPA, et al., Defendants.

No. 01 Civ. 9033(PKL).

United States District Court, S.D. New York.

May 5, 2004.

Thomas Willoughby, Kipp C. Leland, Hill Rivkins & Hayden LLP, New York, NY, for Plaintiffs Delphi–Delco Electronics Systems and Delphi Energy and Engine Management Systems, Divisions Of Delphi Automotive Systems, LLC.

LeRoy Lambert, Daniel J. Fitzgerald, Healy & Baillie, LLP, New York, NY, for Defendants Ace Shipping Corp. and Ace Young, Inc.

Randolph Donatelli, Cichanowicz, Callan, Keane, Vengrow & Textor, LLP, New York, NY, for Defendant Hanjin Shipping Co., Ltd.

Paul Keane, Cichanowicz, Callan, Keane, Vengrow & Textor, LLP, New York, NY, for Defendants Nippon Yusen Kaisha,

d.b.a. NYK Line (sued as NYK Line, Inc.); P & O Nedlloyd, Ltd. (sued as P & O Nedlloyd B.V.); Beteilgungs–Kommanditgesellschaft MS Northern Divinity Schiffahrtsgeschaft GMBH & Co.; Kommanditgesellschaft MS Santa Ana Offen Reederie GMBH & Co. c/o Reederie Claus–Peter Offen (GMBH & Co.) (sued as KS MS Santa Ana Offen Reederie); Sertosa Shipping Corp.; Sovereign Financial Services (Manchester) Ltd.; Oceanship III CV; Oceanship Beheer III B.V.; Oceanship I B.V.; and Oceanship Beheer I B.V.

## *OPINION AND ORDER*

LEISURE, District Judge.

Plaintiffs Delphi–Delco Electronics and Delphi Energy and Engine Systems, divisions of Delphi Automotive Systems, LLC (collectively, "Delphi" or "plaintiff") bring this admiralty and maritime action seeking damages resulting from the alleged misdelivery of numerous shipments of automotive parts. Delphi seeks damages totaling $8,000,000 from numerous defendants, including Ace Shipping Corp. and Ace Young, Inc. (collectively "Ace"); Hanjin Shipping Co., Ltd. ("Hanjin"); Nippon Yusen Kaisha, d.b.a. NYK Line (sued as NYK Line, Inc.) ("NYK"); and P & O Nedlloyd, Ltd. (sued as P & O Nedlloyd B.V.) ("P & O Nedlloyd"), who were involved in shipping the parts from the United States to Busan, South Korea. Ace now moves for partial summary judgment limiting its liability and the liability of its subcontractors to $500 per package, or $190,500, under § 1304(5) of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. 1304(5). Hanjin moves for similar relief, limiting its liability to $500 per package, or $50,500, under COGSA. NYK and P & O Nedlloyd, on their own behalf and on behalf of several vessel-owning defendants (for the purposes of

this motion, collectively, "NYK defendants"), move to dismiss the claims against them based on a forum selection clause in NYK's standard bill of lading terms and conditions. In the event the Court holds the forum selection clause unenforceable, the NYK defendants move for partial summary judgment limiting their liability to $500 per package under COGSA.[1] Delphi opposes each of these motions and brings its own motion for partial summary judgment striking the $500 package limitation defense with regard to Hanjin and NYK. For the reasons stated below, the Court grants in part and denies in part the motion of defendant Ace; grants in part and denies in part the motion of defendant Hanjin; denies the NYK defendants' motion to dismiss pending further discovery and therefore does not reach their motion for partial summary judgment; and denies the motion of plaintiff Delphi.

## BACKGROUND

This action stems from the sale and shipment of various automotive parts by Delphi from the United States to Daewoo Corporation ("Daewoo") in Busan, South Korea. Delphi arranged to ship most of these parts through Ace, a non-vessel operating common carrier ("NVOCC"), which issued 91 bills of lading to Delphi covering the majority of these shipments.[2] According to Delphi, Daewoo's payment for these shipments was secured by letters of credit issued by various Korean banks. These letters of credit required Delphi to obtain "full on board" bills of lading that consigned the parts to the issuing banks rather than Daewoo in order for Delphi to obtain payment on the letters. (Quinnete Decl. ¶¶ 6–9, Ex. 2; Wolf Decl. ¶¶ 6–9, Ex. 2.) Consistent with this requirement, the 91 Ace bills of lading contain the term "FOB USA PORT" and are consigned to the order of the banks that issued the letters of credit. (Lambert Aff., Exs. 1–91; Quinnete Decl. ¶ 10; Wolf Decl. ¶ 10.)

Ace, in turn, arranged for the actual shipment of the parts to South Korea

---

1. These other moving defendants are Beteilgungs–Kommanditgesellschaft MS Northern Divinity Schiffahrtsgeschaft GMBH & Co.; Kommanditgesellschaft MS Santa Ana Offen Reederie GMBH & Co. c/o Reederie Claus–Peter Offen (GMBH & Co.) (sued as KS MS Santa Ana Offen Reederie); Sertosa Shipping Corp.; Sovereign Financial Services (Manchester) Ltd.; Oceanship III CV; Oceanship Beheer III B.V.; Oceanship I B.V.; and Oceanship Beheer I B.V. G–Ace PTE. Ltd. (sued as G–Ace Private Ltd.) was originally included in this group of moving defendants, however, by stipulation of the parties, that appearance has been vacated. (See Stipulation and Order of 9/03/02.) Delphi points out that four of these entities, Sovereign Financial Services (Manchester) Ltd., Oceanship III CV, Oceanship I B.V., and Oceanship Beheer I B.V., are not parties named in this action and that none of the NYK defendants, other than NYK, have served an answer. (Plaintiff's Resp. to NYK's 56.1 Stmt. ¶ 2.) The parties not named in the complaint are not properly before the Court; however, the Court will leave open the effect of their appearance with respect to this motion, given the difficulty all sides have encountered in determining the correct names of the entities involved in this action. The Court further notes that a motion to dismiss based on a forum selection clause may be brought prior to filing an answer and that the Court need not postpone ruling on a motion for summary judgment where the moving defendant has failed to file an answer if the answer would not clarify the issues raised by the motion or aid the Court in determining whether there are any genuine issues of material fact that would preclude granting summary judgment. See Rashidi v. Albright, 818 F.Supp. 1354, 1357 (D.Nev. 1993). There is no indication here that answers by the other NYK defendants would change the Court's analysis of their motion.

2. Delphi alleges that Ace failed to issue or provide Delphi with bills of lading for some of these shipments. This Opinion and Order addresses only those shipments for which bills of lading have been produced.

through the ocean carriers Hanjin and NYK. Hanjin, which was party to a service agreement with Ace, transported its share of the shipments in containers on board the Hanjin Amsterdam, the Hanjin Athens, the Hanjin Paris, and the Hanjin Valencia. Rather than issuing bills of lading for these shipments, however, Hanjin issued electronic sea waybills at the request of Ace. These waybills list Ace as the shipper, but consign the shipments to either Daewoo or "Sun Express Corp.," as opposed to the Korean banks listed as consignees in the Ace bills of lading. (Lee Decl., Ex. 4.) NYK, which arranged to transport its share of the shipments on vessels either slot or time chartered from P & O Nedlloyd and the other NYK defendants, also issued electronic sea waybills at Ace's request for the shipments it carried. The NYK waybills list either Ace or Daewoo as shipper and Daewoo as consignee. (Ferguson Decl., Ex. A.)

Without specifying the factual basis for its loss, Delphi alleges that it suffered damages when Ace, Hanjin and the NYK defendants delivered the parts to third parties (presumably Daewoo and Sun Express) without production of the pertinent bills of lading. Delphi further alleges that Ace is liable for issuing false bills of lading, failing to issue bills of lading and delivering the shipments without payment. As noted above, Ace and Hanjin now bring motions for summary judgment seeking to limit their liability, if any, to $500 per package under COGSA. The NYK defendants move for dismissal based on a forum selection clause in NYK's standard bill of lading and, only in the event that the Court finds the forum selection clause unenforceable, for summary judgment limiting their liability to $500 per package under COGSA. Delphi opposes each of these motions and makes its own motion for summary judgment striking Hanjin and NYK's package limitation defense.

It bears noting that at this stage of the litigation, the factual record before the Court is somewhat sparse, as the parties have elected to bring motions on the applicability of COGSA's $500 per package liability limitation and the enforceability of NYK's forum selection clause prior to engaging in extensive litigation on the underlying merits of the case. The benefits of such a strategy are clear: an early determination of the parties' liability exposure in this Court may facilitate settlement and streamline the course of the action going forward. Unfortunately, the potential for delay and wasted effort resulting from premature motions for summary judgment are sometimes under appreciated by over-anxious litigants. As will become clear in the discussion below, additional discovery prior to these motions likely would have enabled the Court to resolve definitively the applicability of NYK's forum selection clause and the package limitation question. On the present record, however, the Court is limited in the conclusions it can reach.

## DISCUSSION

### I. The Standard for Summary Judgment

A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Holt v. KMI–Continental Inc., 95 F.3d 123, 128 (2d Cir.1996). The substantive law underlying a claim determines if a fact is material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude

the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering the motion, "the judge's function is not himself to weigh the evidence and determine truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505; *see also Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

In determining whether genuine issues of material fact exist, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Holt,* 95 F.3d at 129. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gallo v. Prudential Residential Serv. L.P.,* 22 F.3d 1219, 1223–24 (2d Cir.1994). "[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). Once the moving party discharges his burden of demonstrating that no genuine issue of material fact exists, the burden shifts to the nonmoving party to offer specific evidence showing that a genuine issue for trial exists. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'" *Delaware & Hudson Ry. Co. v. Consolidated Rail,* 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In

other words, "[t]he non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation of conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quotations omitted). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Cont'l Group,* 859 F.2d 1108, 1114 (2d Cir.1988) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

## II. Per Package Liability for Cargoes Shipped Under the 91 Ace Bills of Lading

Ace moves for partial summary judgment limiting its potential liability, and the potential liability of its subcontractors, pursuant to COGSA's per package liability limitation, which provides,

> Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ..., unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be *prima facie* evidence, but shall not be conclusive on the carrier.

46 U.S.C.App. § 1304(5). Ace argues that the 91 Ace bills of lading clearly identify 381 packages of goods and that Delphi was afforded fair opportunity to declare a higher value but chose not to do so. Therefore, according to Ace, its liability is limited to $190,500, or $500 per package. Ace further submits that its subcontractors, including the ocean carriers NYK, Hanjin, and the vessels on which the cargoes were ultimately shipped, are entitled to the

same $500 package limitation pursuant to a "Himalaya Clause" in the Ace bills of lading. That clause provides,

> It is understood and agreed that other than the said Carrier, no person whatsoever (including the Master, officers and crew of the vessel, all servants, agents, employees, representatives, and all stevedores, terminal operators, crane operators, watchmen, carpenters, ship cleaners, surveyors and other independent contractors whatsoever) is or shall be deemed to be liable with respect to the Goods as Carrier, bailee or otherwise howsoever, in contract or in tort. If, however, it should be adjudged that any other than said Carrier is under any responsibility with respect to the Goods, all limitations of an exonerations from liability provided by law or by the terms hereof shall be available to such other persons as herein described.

(Lambert Aff., Ex. 92, Terms and Conditions ¶ 3.)

Delphi does not contest the applicability of COGSA to the Ace bills of lading or claim that it did not have a fair opportunity to declare higher value. Instead, Delphi argues that Ace may not claim the benefit of COGSA's package limitation because the bills of lading issued by Ace were materially false and fraudulent. Specifically, Delphi contends that at the time Ace issued the bills of lading to Delphi consigning the goods to the order of the various Korean banks, it had already arranged with NYK and Hanjin to ship the goods to Korea under electronic waybills that named either Daewoo or Sun Express as consignees. Thus, according to Delphi, the statements on the Ace bills of lading that the goods were consigned to the Korean banks were false and fraudulent at the time they were issued. Delphi claims that it relied on these statements to ensure

that the goods were not released to Daewoo until Daewoo had paid for them and that this purpose was frustrated by Ace's actions. In addition, Delphi argues that values were, in fact, declared on 71 of the 91 bills, totaling $3,025,971.74, precluding summary judgment limiting Ace's liability as to these cargoes. With regard to the Himalaya Clause, Delphi argues that the clause does not cover ocean carriers such as NYK and Hanjin, and that it would be inappropriate for the Court to rule on the applicability of the clause to unnamed subcontractors as requested by Ace.

### A. Deviation and "False" Bills of Lading

■ Under a long line of cases extending back to the pre-COGSA common law, a carrier may not rely on contractual or statutory limitations on liability where the carrier has voluntarily and unjustifiably deviated from the usual commercial or contractual route. *See Sedco, Inc. v. S.S. Strathewe,* 800 F.2d 27, 31 (2d Cir.1986); *General Elec. Co. v. S.S. Nancy Lykes,* 706 F.2d 80, 86–88 (2d Cir.1983) (Lumbard, J.); *Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser,* 507 F.2d 68, 70–71 (2d Cir.1974) (Friendly, J.) (citing, among others, *The Willdomino,* 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927) and the English case *Joseph Thorley, Ltd. v. Ortus S.S. Co., Ltd.,* 1 K.B. 660 (C.A.1907)). Unreasonable deviation by the carrier "is a fundamental breach of the contract of carriage; by engaging in such a deviation, the vessel 'ousts' the contract of carriage and the provisions limiting the carrier's liability incorporated therein, thereby rendering the carrier an 'insurer' of the cargo." *Mobil Sales and Supply Corp. v. M.V. Banglar Kakoli,* 588 F.Supp. 1134, 1146–47 (S.D.N.Y.1984) (Weinfeld, J.).[3] The devia-

---

**3.** The doctrine had its roots in the law of marine insurance, whereby, absent a "held

tion doctrine, which originally applied to geographic deviations in the carrier's route, has come to encompass cases where the carrier has stowed cargo on deck that it had agreed to carry below deck, referred to as "quasi deviation." *Sedco*, 800 F.2d at 31–32; *Du Pont de Nemours Intern. S.A. v. S. S. Mormacvega*, 493 F.2d 97 at 101–02 (2d Cir.1974). Thus, even after the enactment of COGSA, a carrier may not limit its liability where it has unreasonably deviated from its proscribed route or stowed goods on deck without authorization, unless it can show that the deviation did not cause the damage in question. *See Sedco*, 800 F.2d at 31–32; *General Elec. Co.*, 706 F.2d at 87–88; *Mobil Sales and Supply Corp.*, 588 F.Supp. at 1146–47; *cf.* 46 U.S.C. app. § 1304(4) ("[A]ny *reasonable* deviation shall not be deemed to be an infringement or breach of this Act or of the contract of carriage and the carrier shall not be liable for any loss or damage resulting therefrom . . . .") (emphasis added).

█ Drawing on the deviation doctrine, as well as principles of estoppel and breach of warranty, the Second Circuit has held that a carrier may lose the benefit of COGSA's package limitation by issuing a bill of lading that erroneously states that goods have been received on board when they have not been so loaded. *See Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841 (2d Cir.1985) (Mansfield, J.). The Court based its ruling in *Berisford Metals* largely on the pre-COGSA case, *Olivier Straw Goods Corp. v. Osaka Shosen Kaisha*, 47 F.2d 878 (2d Cir.1931), in which Judge Augustus Hand, joined on the panel by

Judges Learned Hand and Swan, held that a carrier who misrepresented in the bill of lading that cargo had been loaded on board could not claim the benefit of a package limitation in the bill of lading in a subsequent action for loss of the cargo. *Id.* at 880. The Court reasoned that although the *carrier* was estopped from denying that the goods were shipped as stated in the bill of lading and thus could not avoid responsibility by claiming that the goods were never, in fact, loaded on the ship, the estoppel did not extend so far as to bind the *shipper* to the bill's liability limiting provision. *Id.* at 879. The Court further found the statement in the bill that the goods had been loaded on board to be a warranty the carrier breached by failing to ship them; this breach of warranty went to the "essence of the contract" and, as with unauthorized deck stowage, presented a fundamental breach, or deviation, that ousted the liability limitations of the bill. *Id.* at 879–80.

The Second Circuit reaffirmed *Olivier*'s holding in *Berisford Metals*, emphasizing the importance of reliance on bills of lading in maritime trade:

[A] negotiable or order bill of lading is a fundamental and vital pillar of international trade and commerce, indispensable to the conduct and financing of business involving the sale and transportation of goods between parties located at a distance from one another. It constitutes an acknowledgement by a carrier that it has received the goods for shipment. It is also a contract of car-

---

covered" clause in the insurance contract, "the assurer is deemed to have intended to accept only that risk that inheres in the expeditious prosecution of the voyage by the usual commercial route. Where the vessel without excuse departs from this route, or delays unreasonably in pursuing the voyage, the policy

is ousted." Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty 66 (2d ed.1975). The deviation doctrine mitigates this harsh result by placing an insurer's liability on the carrier when the carrier has unreasonably deviated from the normal route. *Id.* at 176–77.

riage. As a document of title it controls the possession of the goods themselves. 779 F.2d at 841. Thus, "[w]hether one likens the carrier's issuance of a false bill of lading with respect to its loading of a cargo to a 'deviation,' a 'breach of warranty' or a representation which it must be 'estopped' to deny, its adverse impact on trade and on reliance on bills as an essential method of facilitating trade is serious." *Id.* at 846. Accordingly, the Court found that the carrier, who had represented in the bill of lading that it had loaded 100 bundles of tin ingots on the ship when in fact it had loaded only 30 bundles, had fundamentally breached the contract of carriage and was therefore precluded from invoking COGSA's limitations on liability as to the 70 unloaded bundles. *Id.* at 848–49.

■ Delphi attempts to characterize the statement in the Ace bills of lading consigning the goods to the order of the Korean banks as a misrepresentation that precludes the application of COGSA's liability limitations under *Berisford.* As a matter of law, however, this argument fails for a number of reasons.

First, even under an expansive view of what constitutes a quasi-deviation or false bill of lading ousting COGSA's liability limitations, courts have limited the applicability of this concept to misrepresentations concerning the physical condition or location of the goods at the time the bill of lading was issued. *See, e.g., Berisford,* 779 F.2d at 847–48 (misrepresentation that packages were loaded on ship); *Mitsui Marine Fire and Ins. Co., Ltd. v. Direct Container Line, Inc.,* 119 F.Supp.2d 412, 416–17 (S.D.N.Y.2000) (same); *Leather's Best Internat'l, Inc. v. MV Lloyd Sergipe,* 760 F.Supp. 301, 311 (S.D.N.Y.1991) (same); *Condor Indus. Internat'l, Inc. v. M.V. Am. Express,* 667 F.Supp. 99, 100 (S.D.N.Y.1987) (applying doctrine where

carrier issued clean bill of lading even though cargo was apparently damaged at the time it was delivered to the carrier); *Am. Indus. Corp. v. M.V. Margarite,* 556 F.Supp. 216, 219 (S.D.N.Y.1983) ("The fraudulent misrepresentation in the bill of lading as to the apparent condition of the [cargo] constitutes a quasi-deviation which renders § 4(5) of the COGSA unenforceable as a limitation upon plaintiff's right to recover full damages sustained."); Thomas J. Schoenbaum, 2 Admiralty and Mar. Law § 10–12 (3d ed.2001). These types of factual representations (i.e., whether the goods are damaged or on board the vessel at the time the bill is issued) are distinct from the legal question of which party is the legitimate consignee of the cargo. Ousting COGSA's package liability limitation based on this type of misrepresentation would require a significant expansion of the doctrine, unsupported by previous case law.

■ Furthermore, in spite of Delphi's attempt to characterize Ace's error as the issuance of false bills of lading, any falsehood in the bills with regard to the consignee did not occur until the goods were delivered to someone other than the consignee on the bill. The gravamen of Delphi's complaint, therefore, is not the issuance of a false bill of lading, but misdelivery of the goods. The Second Circuit has pointedly declined to extend the doctrine of deviation to misdelivery cases, even where misdelivery is willful or criminal. *See B.M.A. Indus., Ltd. v. Nigerian Star Line, Ltd.,* 786 F.2d 90, 92 (2d Cir.1986) (per curiam). To the contrary, in *B.M.A Industries,* the Court found that misdelivery, as with non-delivery, was not drastic enough a deviation to justify ousting COGSA's liability limitations. *Id.* The Court extended its holding to cover even cases of *corrupt* or *criminal* misdelivery in light of its con-

cern that conditioning a finding of deviation on the intent of the defendant carrier would create too much uncertainty and result in enormous potential liability based on the fact finder's determination of culpability in almost all cases involving improper delivery. *Id.; see also Iligan,* 507 F.2d at 72 (declining to extend the deviation doctrine to include the wanton or willful tendering of an unseaworthy vessel by the carrier, noting that to do so "would mean that in almost all cases of loss due to unseaworthiness ... shippers or, realistically, their insurers, would demand a further inquiry into the degree of the carrier's culpability, with enormous potential liability ... riding on the decision of the fact finder, protected in many circuits by the 'unless clearly erroneous' rule"). Characterizing the alleged improper delivery in this case as an unreasonable deviation because the bill of lading misrepresented Ace's instructions to the underlying carriers would be inconsistent with these principles and would result in an unwarranted end-run around the Second Circuit's ruling in *B.M.A. Industries.*

Finally, the Second Circuit and the leading admiralty commentators have cast substantial doubt on the continued validity of the deviation doctrine in light of modern shipping and marine insurance practices. As Judge Friendly noted in *Iligan,*

[E]ven the holding that a deviation in the geographic sense voids limitations on the carrier's liability seems inconsistent with the language of COGSA. It has been justified by what is–or at least was–the especially serious effect of such a deviation on the shipper.... Up to this point the concept of 'quasi deviation' in the United States has recognized only one instance, deck stowage of cargo which the carrier had agreed to carry below deck, for which the carrier becomes liable in full as an insurer of the shipper's cargo. Whatever may be thought of that principle, it is easy to administer and carriers know the risks.

507 F.2d at 72. Accordingly, the doctrine of deviation, or quasi-deviation, "is not one to be extended." *Id.; see also* Gilmore and Black, The Law of Admiralty 183 ("It would seem unwise to extend analogically and by way of metaphor a doctrine of doubtful justice under modern conditions, of questionable status under COGSA, and of highly penal effect."); Schoenbaum, 2 Admiralty and Mar. Law § 10–32. As a result, the Court does not view Ace's conduct in this regard as a deviation or misrepresentation that prevents it from invoking COGSA's liability limitation.

**B. Declared Value of the Cargo**

Delphi next argues that Court should deny Ace's motion in any event as to 71 of the Ace bills of lading wherein Delphi did, in fact, declare the value of the cargo. Those bills of lading list the value of the cargo under the section titled "DESCRIPTION OF COMMODITIES;" however, they do not contain a value in the portion of the bill that reads "DECLARED VALUE _____ READ CLAUSE 29 HEREOF CONCERNING EXTRA FREIGHT AND CARRIER'S LIMITATIONS OF LIABILITY." (Lambert Aff. Exs 1–91.) Ace, on the other hand, argues that merely including a value in the description of the cargo is insufficient to constitute a declaration of value under COGSA. In support of its argument, Ace emphasizes that it was Daewoo, not Delphi, who paid the freight for the shipments and, although Delphi inserted values in the bills of lading, Daewoo did not pay a higher *ad valorem* rate based on the declared value. Ace, however, does not submit any evidence that it ever requested payment of the *ad valorem* rate after Delphi inserted the values in the bills of lading. According to Ace, "The

freight paid by [Daewoo] had nothing to do with the FOB values that Delphi required us to place on some of the Ace house bills of lading; indeed, these values were requirements of the underlying letters of credit. In any event, the values for the goods that appeared in these house bills of lading issued by Ace were NOT for the purpose of calculating the freight rate paid by [Daewoo.]" (Statement of Kevin Choi ¶ 3.) In essence, Ace takes the position that Delphi must show that it declared the value of the cargo *and* that it, or Daewoo, paid the higher *ad valorem* rate, regardless of whether Ace ever requested payment of the higher rate, in order to prevent the application of COGSA's liability limitation.

Not surprisingly, the question of whether listing the value of the goods under the description of the cargo in a bill of lading is sufficient to prevent the application of COGSA's package limitation has resulted in few reported decisions. In the modern commercial context, it is rare for a shipper to declare the value of the goods: Carriers typically demand a much higher freight when a shipper declares the value of the cargo as compensation for shouldering increased potential liability. Instead of declaring value and paying the higher rate, most shippers pay the standard rate for ocean transport and obtain separate insurance to protect the full value of the cargo. *See generally* 8 Benedict on Admiralty § 16.11(B)(6). Furthermore, the text of COGSA's liability limitation clause is relatively unambiguous on this question, limiting a carrier's liability to $500 per package "unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading." 46 U.S.C. § 1304(5). This section sets up a clear default rule: "If the shipper does nothing, the carrier's liability is limited to $500 per package. But the shipper can increase this limitation amount

simply by declaring a higher value and ensuring that it is inserted in the bill of lading." *Stolt Tank Containers, Inc. v. Evergreen Marine Corp.*, 962 F.2d 276, 279 (2d Cir.1992) (quoting Michael F. Sturley, *The Fair Opportunity Requirement Under COGSA Section 4(5): A Case Study in the Misinterpretation of the Carriage of Goods by Sea Act (Part 1)*, 19 J. Mar. L. & Com. 1, 4 (1988)); *see also General Motors Corp. v. Moore–McCormack Lines, Inc.*, 451 F.2d 24, 26 (2d Cir.1971) ("If a shipper wishes to avoid this $500 limit, he may declare a higher value, thus alerting the carrier of its potential liability and allowing it to charge extra freight, if appropriate.").

Ace cites three cases from outside the Second Circuit in support of its argument; however, these cases are distinguishable on their facts, and, in any event, are not binding on this Court. First, in *Marine Transp. Servs. v. Python High Performance Marine Corp.*, 16 F.3d 1133 (11th Cir.1994), the court addressed the question of whether the shipper, by inserting the alleged value of the cargo in a booking notice and in a section of the bill of lading marked "INSURANCE COVERAGE," prevented the carrier from limiting its liability under the terms of the bill of lading. *Id.* at 1141 & n. 14. Notably, the court's analysis in *Marine Transportation Services* was limited to interpreting a provision in the carrier's bill of lading, which required the shipper to declare a higher value in the bill and pay the applicable *ad valorem* tariff rate in order to avoid the liability limitation. *Id.* at 1141. Although the court noted the carrier's provision was similar to COGSA's § 1304(5), the statute did not figure in its analysis; furthermore, because the shipment involved transportation between Florida and Puerto Rico, COGSA did not apply, *ex proprio vigore*.

*Id.* at 1141 & n. 13; *see also* 46 U.S.C.App. § 1300.

The court held that including the value of the cargo in the booking notice, as opposed to on the face of the bill of lading, was insufficient to prevent the application of the liability limitation clause in the carrier's bill of lading and that the amount listed under "INSURANCE COVERAGE" was for the purpose of obtaining insurance, not declaring value to prevent the carrier from limiting its liability. 16 F.3d at 1141. Only after concluding that the shipper had failed to declare a higher value, did the court go on to address the requirement in the carrier's bill that the shipper pay additional freight to obtain the benefit of a higher valuation. The court found that the shipper had not paid any additional freight and that this further supported the conclusion that the shipper had not intended to place a higher value on the cargo. *Id.* at 1141. Here, however, Delphi inserted the value of the cargoes on the face of the Ace bills of lading under the section for describing the goods; there is no indication that the amount is there for any separate purpose, i.e., to declare the amount of insurance sought, other than to show the value of the goods. Accordingly, Delphi has a much stronger argument than the shipper in *Marine Transportation Services* that it intended to declare the value of the shipment for the purpose of alerting the carrier to its value.

■ The other cases cited by Ace are similarly distinguishable, *see, e.g., Fireman's Fund Ins. Co. v. Tropical Shipping and Construction Co.,* 254 F.3d 987, 999–1000 (11th Cir.2001) (finding that listing of insurable value of cargo in bill of lading was not a declaration of value for the purpose of avoiding COGSA's liability limitation provision); *Internat'l Fire and Marine Ins. Co., Ltd., v. Silver Star Shipping America, Inc.,* 951 F.Supp. 913, 920–21 (C.D.Cal.1997) (finding that where the shipper had not declared a cargo value in the bill of lading, burden was on shipper to show that it had been charged *ad valorem* rates that would suggest that $500 limitation did not apply), and do not support the proposition that a shipper who has included the value of the cargo in the bill of lading must show that it paid the *ad valorem* rate, even in the absence of a request for such payment from the carrier, in order to avoid COGSA's liability limitation. Moreover, the sole reported decision in the Second Circuit addressing this issue has rejected Ace's argument. *See David R. Webb Co., Inc. v. M/V Henrique Leal,* 733 F.Supp. 702, 709 (S.D.N.Y.1990) (finding that the statement "FOB VALUE $98,721.00" under the section marked "Description of packages and goods" was a sufficient declaration of the value of the cargo under section 1304(5) in spite of the fact that the shipper had not paid the applicable *ad valorem* freight); *accord Ins. Co. of North America v. Empresa Lineas Maritimas Argentinas, S.A.,* 90–290–Civ.–J–16, 1990 WL 300778 at *2 (M.D.Fla. 1990); *Atlantic Mut. Ins. Co. v. Companhia De Navegacao Maritima Netumar,* 120 Misc.2d 667, 669, 467 N.Y.S.2d 497, 499 (1st Dept.1983). *But cf.* George F. Chandler III, *Damages to Cargo: The Measure of Damages to Cargo–Redux,* 72 Tul. L.Rev. 539, 555 (1997) (noting that whether a shipper must also pay the higher rate is "far from being settled"). Once Delphi inserted the value of the cargo in the bill of lading, it was incumbent on Ace to demand the higher *ad valorem* rate.[4]

___

4. In this regard, the Court notes that the liability limitation clause of Ace's bill of lading provides that the carrier's liability is limit-

ed to $500 per package unless the value of the goods is declared "and extra freight paid *if required*" (emphasis added). The Court reads

Having failed to do so, it cannot claim that its liability should be limited based on Delphi's failure to pay the higher rate.

■ One of the chief virtues of COG-SA's liability limitation provision is its simplicity and predictability. To be sure, a showing that Delphi or Daewoo did, in fact, pay the higher freight would bolster Delphi's argument that it sought to avoid the default rule; however, because the value was inserted in the bill of lading and no higher payment was requested, such a showing is not necessary to defeat Ace's motion for summary judgment. At the very least, Delphi has raised a genuine issue of material fact as to whether it declared the value of the cargoes for the purpose of avoiding COGSA's liability limitation. *Cf. Nemeth v. General Steamship Corp. Ltd.*, 694 F.2d 609, 612 (9th Cir.1982) (finding that where shipper claimed to have notified carrier of value of cargo there was a genuine issue of material fact as to whether shipper had attempted to declare a higher value for the purposes of section 1304(5)); *Internat'l Fire and Marine Ins. Co., Ltd.*, 951 F.Supp. at 920 ("If [shipper] had, in a space other than the one provided specifically for liability limitation purposes, made some sort of declaration on the bill of lading to the effect that it wished to declare a higher value for liability purposes, that could well have created an issue of material fact."). Therefore, Ace's motion to limit its potential liability under the 71 bills in which the value of the cargo is listed must be denied.

As for the 20 bills of lading that do not include the value of the goods, Ace's motion to limit its liability to $500 per package is granted.

## C. Ace's Himalaya Clause

The final issue with regard to Ace's motion for summary judgment is the extent to which the Himalaya clause in the Ace bills extends the benefits of Ace's package limitation to Hanjin, NYK and Ace's other subcontractors. Although it does not specify which term in the clause applies to Hanjin or NYK, i.e., "Master, officers and crew of the vessel, all servants, agents, employees, representatives, and all stevedores, terminal operators, crane operators, watchmen, carpenters, ship cleaners, surveyors, [or] other independent contractors whatsoever," Ace views the clause as extending the per package liability limitation to all subcontractors who perform the duties of "receipt, loading, carriage, discharge, and/or delivery." (Ace Mem. at 9.)

On the present record, it is not clear that the Himalaya clause, as a matter of law, applies to Hanjin and NYK. Neither Ace nor Delphi cites any case where an ocean carrier such as Hanjin or NYK sought the protection of a Himalaya clause in the bill of lading. Indeed, such a case would be unusual since multiple carriers are ordinarily subject to the same package limitation as the party issuing the bill of lading under 46 U.S.C.App. § 1304(5).

this provision as placing the burden on Ace to charge extra freight should the shipper choose to declare a higher value. *See generally, Allied Chemical Intern. Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482 (2d Cir.1985) ("We bear in mind that bills of lading are contracts of adhesion and, as such, are strictly construed against the carrier."). Even if the bill of lading purported to place an affirmative duty on the shipper to determine the *ad valorem* rate and

tender payment absent a request from the shipper, the result would likely be the same here since such a requirement might very well conflict with COGSA. *See* 46 U.S.C.App. § 1303(8) ("Any clause ... in a contract of carriage relieving the carrier or the ship from liability for loss or damage to ... the goods ... or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect."); *David R. Webb*, 733 F.Supp. at 709.

*See Thyssen, Inc. v. S/S Eurounity,* 21 F.3d 533, 540–41 (2d Cir.1994) ("Section 1304(5) establishes that a plaintiff is entitled to a single recovery not to exceed the equivalent of $500 per package. Were we to adopt the interpretation [that the carrier and the vessel were each liable for $500 per package] plaintiffs effectively could 'side-step' COGSA's limitation of the amount of damages that a plaintiff is entitled to recover when multiple defendants are subject to liability."). The applicability of the principle elucidated in *Thyssen,* however, is a separate consideration from determining which parties are covered by a Himalaya clause and, as none of the parties have briefed the issue, the Court will not decide it here. With regard to the limited issue of whether Hanjin and NYK are protected under the Himalaya clause, the Court is mindful that such clauses extending limitations on liability to third parties must be "clearly expressed. A bill of lading containing such a limitation will be strictly construed against the parties whom it is claimed to benefit." *Lucky–Goldstar Int'l (America), Inc. v. S.S. California Mercury,* 750 F.Supp. 141, 145 (S.D.N.Y.1990) (quoting *Toyomenka, Inc. v. S.S. Tosaharu Maru,* 523 F.2d 518, 520–21 (2d Cir.1975)).

■■ Here, the Himalaya clause does not specifically include additional carriers or charterers within its scope and Ace has not presented any evidence that the clause was intended to cover such entities.[5]

More importantly, however, as discussed in the next section, the record on the relationship between Ace and Hanjin and NYK is not fully developed as would be necessary to determine whether Hanjin and Ace are "agents" or "independent contractors" for the purpose of the clause. In addition, the Court notes that neither Hanjin nor NYK have claimed that they are covered by the clause.[6] As for Ace's attempt to extend the benefits of the clause to unnamed subcontractors, there is clearly an insufficient record for making such a determination, which in any event would be advisory in nature. Under these circumstances, the Court finds that Ace has failed to meet its burden of showing that Hanjin, NYK and other unspecified subcontractors are entitled to the protection of the Himalaya clause in the Ace bill of lading and summary judgment on this point is denied.

### III. The NYK Defendants' Motion to Dismiss

Before addressing the issue of whether Hanjin and NYK may limit their potential liability to $500 per package, the Court will first address the NYK defendants' motion to dismiss based on the forum selection clause contained in NYK's standard bill of lading terms and conditions. The clause states: "The contract evidenced by or contained in this Bill of lading shall be governed by Japanese law except as may be otherwise provided herein, and any action

---

**5.** In contrast, carriers and charterers are specifically referenced in other clauses of the Ace bills of lading. For example, the term "Carrier" is defined as "the Carrier named on the face side hereof, the vessel, her owner, Master, operator, demise charterer, and, if bound hereby, the time charterer, and any substitute Carrier, whether the owner, operator, charterer or Master shall be acting as Carrier or bailee." (Lambert Aff., Ex. 92, Terms and Conditions ¶ 2(a).) A "Participating Carrier" is defined as "any other water, land, or air

Carrier performing any stage of the Combined Transport." (*Id.* ¶ 2(h).)

**6.** In fact, Hanjin correctly points out that where an NVOCC contracts with an actual ocean carrier, the liability of each is ordinarily governed by reference to its *own* bill of lading. *See Royal Ins. Co. v. M/V ACX Ruby,* No. 97 Civ. 3710(MBM), 1998 WL 524899 at *2 (S.D.N.Y.1998).

thereunder shall be brought before the Tokyo District Court in Japan." (Ferguson Decl., Ex. C, ¶ 3.) The NYK defendants argue that this clause and, indeed, all the NYK standard bill of lading terms and conditions are incorporated by reference in the electronic sea waybills that NYK issued to Ace, which served as the contracts of carriage for the cargoes shipped by NYK. Furthermore, they argue that the forum selection clause is mandatory and broad in scope, covering both contract and tort claims; that it is valid and enforceable; that it is binding on Delphi; and that all of the NYK defendants can claim the benefit of the provision.

Delphi takes the position that the NYK defendants' motion to dismiss based on the forum selection clause is premature under Rule 56(f). Delphi claims that, pursuant to an agreement between the parties, it had postponed discovery regarding the existence of an agency relationship between Ace and both NYK and Hanjin until after the parties brought motions on the applicability of COGSA's liability limitation to the various contracts of carriage in this case. Delphi points to the representation on each of the Ace bills of lading that Ace issued the bills "AS AGENT FOR" either NYK or Hanjin, "THE CARRIER," (Lambert Aff., Exs. 1–91; Leland Aff., Ex. A), and argues that it is entitled to discovery on the question of whether Ace was, in fact, acting as an agent for NYK or Hanjin. If such an agency relationship existed, Delphi argues, NYK would be bound by the forum selection clause in the Ace bill of lading, which states: "This bill of lading shall be construed according to the laws of the United States and the Merchant agrees that any suits against the Carrier shall be brought in the Federal Courts of the United States." (Lambert Aff., Ex. 92, Terms and Conditions ¶ 34; Leland Aff., Ex. B.)

Rule 56(f) provides an important check on a moving party's ability to obtain summary judgment after only a limited opportunity for discovery. The Rule states:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. Pro. 56(f). Accordingly, summary judgment is appropriate only "after adequate time for discovery," *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548, and should be denied "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition," *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

■ A party seeking to avoid summary judgment on the ground that it needs additional discovery in order to defeat the motion must file an affidavit explaining: "1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and 2) how those facts are reasonably expected to create a genuine issue of material fact; and 3) what efforts the affiant has made to obtain those facts; and 4) why those efforts were unsuccessful." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985) (Winter, J.); *accord Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir.1999); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994); *Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891 F.2d 414, 422 (2d Cir.1989). Recognizing that Rule 56(f) is an important safeguard against improvident or premature motions for summary judgment, courts generally avoid overly technical rulings under this subdivision

and apply it with a spirit of liberality. *See, e.g., Valley Nat'l Bank v. Greenwich,* 254 F.Supp.2d 448, 454 (S.D.N.Y.2003); *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 945 F.Supp. 693, at 706 (S.D.N.Y.1996) (citing 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2740, at 532 (2d ed.1983)). Thus, while failure to file an affidavit meeting the foregoing requirements is sufficient grounds to reject a claim that the opportunity for discovery was inadequate, it is not automatically fatal to such a request. *Paddington Partners,* 34 F.3d at 1137–39; 10B Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2740, at 403 (3d ed.1998).

The rule, however, "is not a shield against all summary judgment motions. Litigants seeking relief under the rule must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative." *Paddington Partners,* 34 F.3d at 1138 (quoting *Sundsvallsbanken v. Fondmetal, Inc.,* 624 F.Supp. 811, 815 (S.D.N.Y.1985)). A court may reject a request for discovery under Rule 56(f) if the request is based on speculation or the mere hope that additional evidence may develop prior to trial. *See Paddington Partners,* 34 F.3d at 1138 (citing *Gray v. Town of Darien,* 927 F.2d 69, 74 (2d Cir.1991)). Furthermore, the rule should not be applied liberally to aid parties "who have been lazy or dilatory." *Bonnie & Co. Fashions,* 945 F.Supp. at

706 (quoting 10A Wright, Miller and Kane, Federal Practice and Procedure § 2740, at 535 (2d ed.1983)).

Delphi has consistently taken the position that whether Ace was acting as an agent for NYK in issuing the Ace bills of lading presents a material issue of fact that Delphi is entitled to probe through discovery.[7] Specifically, Delphi seeks to depose the individuals at Ace and NYK who were responsible for supervising the relationship between the two companies and to conduct related documentary discovery. Delphi argues that if Ace was in fact acting as an agent for NYK, NYK would be bound by the United States forum selection clause in the Ace bills of lading. Even if such an agency relationship did not exist, Delphi submits that NYK might be bound by the Ace forum selection clause under a theory of agency by estoppel if it knew Ace was representing itself to Delphi and other shippers as the agent of NYK and failed to correct such an impression. As for its reason for not obtaining such discovery sooner, Delphi states, through the affidavits of two attorneys involved in this case, that the parties, including NYK, had agreed to postpone discovery on agency issues so that the parties could bring motions on the applicability of COGSA's $500 per package liability limitation, which might significantly reduce the amount of money in dispute. (*See* Leland 56(f) Aff. ¶¶ 8–12; Willoughby Aff. ¶¶ 3–6.)

---

7. In its initial briefing on this issue, Delphi relied on statements in its memorandum of law and the Affidavit of Thomas E. Willoughby, Esq. to the effect that the parties, including NYK, had agreed to postpone discovery on issues relating to agency until after the Court had determined the applicability of COGSA's package limitation to the various bills of lading and waybills involved in this case. After NYK complained to the Court that Delphi had failed to respond adequately to its motion to dismiss, the Court ordered Delphi and NYK to submit additional briefing on the issue and instructed Delphi to submit a Rule 56(f) affidavit if it maintained the position that discovery was needed on the agency issue. In its supplemental briefing, Delphi submitted such an affidavit in which it further developed its argument that the Court should require discovery on the agency issue before ruling on the enforceability of the forum selection clause.

The NYK defendants, conceding that their rights with regard to the forum selection clause will be determined by NYK's rights, submit a number of arguments in favor of determining the enforceability of the forum selection clause without further discovery. These arguments can be summarized as follows: First, contractual choice-of-forum clauses are highly favored under maritime law and should be addressed prior to the merits of the underlying action. Second, the statement of agency in the Ace bills of lading is inadmissible as evidence of an agency relationship and cannot create a genuine issue of material fact. Third, additional discovery cannot reasonably be expected to create a genuine issue of material fact because 1) an NVOCC such as Ace is an agent of the shipper, here Delphi, as a matter of law; 2) Ace has failed to show justifiable reliance on the representation of agency as required of a party relying on agency by estoppel; 3) engaging Ace as an agent would not serve any business purpose for NYK and, indeed might subject NYK to liability for violating the terms of its filed tariff; and 4) such an agency relationship is not supported by any of the parties' submissions with regard to the package limitation issue. In support of its argument that discovery on the agency issue would be unreasonable, the NYK defendants also offer declarations from several NYK employees stating, in effect, that no agency relationship existed between Ace and NYK.

 The Court finds the NYK defendants' arguments for foreclosing discovery on the agency issue to be unavailing. While forum selection clauses are presumptively valid and perform the important function of dispelling uncertainty relating to the proper forum for suits arising under maritime contracts of carriage, *see Vimar Seguros y Reaseguros, S.A. v. M/V*

*Sky Reefer,* 515 U.S. 528, 537–538, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995); *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 593–94, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), such considerations do not control the determination of whether or not Delphi is entitled to discovery on the issue of agency. Rather, the key question is whether the existence of an agency relationship as alleged by Delphi would change the forum selection clause analysis. NYK does not dispute that if Ace issued bills of lading as an agent for NYK, NYK would be bound by the United States forum selection clause in the Ace bills. Accordingly, the existence of such an agency relationship would clearly present a genuine issue of material fact essential to Delphi's opposition to the NYK defendant's motion to dismiss. Furthermore, evidence submitted by a party seeking relief under Rule 56(f) " 'need not be presented in a form suitable for admission as evidence at trial, so long as it rises sufficiently above mere speculation' and therefore 'reliance on hearsay is not, per se, a dispositive defect under [the rule.]' " *Valley Nat'l Bank,* 254 F.Supp.2d at 461 (quoting *Simas v. First Citizens' Federal Credit Union,* 170 F.3d 37, 46 (1st Cir.1999)). Thus, the evidentiary infirmities of Ace's representation of agency are not fatal to Delphi's request under Rule 56(f), so long as that representation provides a reasonable and non-speculative basis for requesting discovery.

██ The NYK defendants' arguments that discovery on the agency issue is not reasonably calculated to create a genuine issue of material fact do have some merit, however, they too, ultimately fail. First, although it is clear that an NVOCC such as Ace is presumed under maritime law to be acting as the agent of the shipper when

it arranges to transport cargoes with ocean carriers such as NYK,[8] this presumption could be rebutted by evidence that Ace, in fact, was acting as an agent for NYK when it issued the bills of lading. *See Kukje Hwajae Ins. Co.*, 294 F.3d at 1175–76 (finding that defendant, an NVOCC, acted as agent for the shipper, based on the normal commercial role of an NVOCC *and the facts of the case*, emphasizing that "[n]othing in the record suggests that the relationship between [the NVOCC] and [the shipper] deviated from the commercial norm"); *Hoechst Celanese Corp. v. M/V Trident Amber*, No. CV 491–025, 1992 WL 179219 at *4–5 (S.D.Ga. June 26, 1992) (holding that whether an NVOCC acting as a freight forwarder was acting as an agent for the shipper or for the vessel owner was a question of fact). Nor is a showing of agency by estoppel out of the question. If further discovery were to reveal that NYK had knowledge of

Ace's representation of agency yet failed to take any action to prevent such the misrepresentation, NYK might be bound by the terms of the Ace bills of lading. The fact that Delphi has not specified the extent to which it justifiably relied on such a misrepresentation is not fatal at this early stage when it need only show that the facts it seeks to discover are "reasonably expected to create a genuine issue of material fact." *Burlington Coat Factory*, 769 F.2d at 926. Similarly, the NYK defendants' assertions that engaging Ace as an agent would not serve NYK's business interests and might subject NYK to liability for violating the terms of its filed tariff suggest that such an agency relationship would have been unwise and, indeed, unlikely. These considerations, however, are insufficient to render Delphi's request unreasonable under the circumstances; the declaration of agency in the Ace bills of

8. The Ninth Circuit recently provided the following informative description of the role played by NVOCCs in the normal commercial context.

> A non-vessel operating common carrier, or NVOCC, contracts with its customers as principal, agreeing to transport their goods on a voyage that includes an ocean leg. An NVOCC commonly issues bills of lading to its customers in its own name, even though it does not operate the ship that will carry the goods on the ocean voyage. It buys space on the carrying ship like any other customer, receiving a bill of lading from the owner or charterer of that ship when the goods are loaded on board. It commonly consolidates goods from several different shippers into a single container, receiving a bill of lading from the ocean carrier in relation to the container as a whole. The NVOCC is not authorized by the owner or master of the carrying ship to issue bills of lading that will bind the ship; indeed, the ocean carrier may have no idea that the party to whom it issues its bill is in fact an NVOCC that has issued bills of lading itself. The relationship between ocean carrier and NVOCC is therefore not one of agency, but

> is a contractual one embodied in the ocean carrier's bill of lading, under which the NVOCC is the shipper. The NVOCC does not contract with the owners of the goods as agent for the ship. Quite the reverse, it contracts with the ocean carrier as agent for the owner of the goods.

*Kukje Hwajae Ins. Co., Ltd. v. M/V HYUNDAI LIBERTY*, 294 F.3d 1171, 1176 (9th Cir.2002) (quoting Martin Davies, *In Defense of Unpopular Virtues: Personification and Ratification*, 75 Tul. L.Rev. 337, 395–96 (2000)). *See also* 46 U.S.C. app. § 1702(17)(B) (2002) (defining an NVOCC for the purposes of the Shipping Act of 1984 as "a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier"); 46 CFR § 520.2 (2004) (same); *Ins. Co. of North America v. S/S Am. Argosy*, 732 F.2d 299, 301 (2d Cir.1984) (Mansfield, J.) ("[F]or the purposes of the Shipping Act, the NVOCC is a hybrid; it is a common carrier with respect to the shippers who use its services. . . . With respect to the vessel and her owner, however, the NVOCC is an agent of the shipper, and thus merely a customer–indeed, only one customer among hundreds on any given voyage.").

lading provides a non-speculative basis for Delphi to request discovery relevant to whether such a relationship existed.

Finally, despite the surfeit of arguments presented by the NYK defendants, they do not dispute that Delphi has not had an opportunity to test its agency claims through discovery. The absence of any evidence of an agency relationship in the motion papers of the other moving parties, and the declarations expressly denying such a relationship submitted by NYK's employees, do not alleviate this consideration. On the contrary, the absence of evidence prior to discovery and the attempt to justify summary judgment here on information seen for the first time in the motion papers are precisely the types of concerns that Rule 56(f) is designed to mitigate.

While Rule 56(f) is improperly invoked by a party seeking to engage in a "fishing expedition", *Capital Imaging Assoc. v. Mohawk Valley Medical Assoc.*, 725 F.Supp. 669, 680 (N.D.N.Y.1989), or hoping to return to the "wishing well of discovery," *Dyson v. Winfield*, 113 F.Supp.2d 35, 42 (D.D.C.2000), the rule recognizes the importance of discovery in defending against summary judgment motions and protects the non-moving party from being "railroaded" by premature motions. *Celotex*, 477 U.S. at 326, 106 S.Ct. 2548. Here, the NYK defendants brought their motion for dismissal and partial summary judgment approximately seven months after NYK filed its answer.[9] At that point, however, the parties had conducted only limited discovery, and according to the uncontroverted affidavits of Messrs. Willoughby and Leland, had agreed to postpone discovery on the agency issue until after bringing motions on the applicability of COGSA's package limitations.[10] This may not have been the soundest strategy; however, it certainly explains why Delphi has not yet obtained the discovery it seeks on this question. Furthermore, the NYK defendant's have made no attempt in their motion papers to show that Delphi had, but squandered, its opportunity for this discovery. Accordingly, the Court denies the motion on the present record, without prejudice to its being re-filed after further discovery. Delphi must conduct discovery on the question of an agency relationship between Ace and NYK, as well as between Ace and Hanjin, with all deliberate speed. Subsequent to an appropriate opportunity for such discovery, the Court will entertain the NYK defendants' motion for dismissal based on the NYK forum selection clause in short order.[11]

**9.** As noted above, of the NYK defendants, only NYK has filed an answer.

**10.** Nor does NYK contest the statement in Mr. Willoughby's affidavit that NYK brought its motion prior to making its Rule 26 disclosures and that, in fact, the only documents produced by NYK were produced as exhibits to their motion papers. (Willoughby Aff. ¶ 16.)

**11.** Although the NYK defendants' initial papers do not state whether its motion for dismissal was brought as a Rule 56 motion for summary judgment or under Rule 12, the parties subsequent papers make clear that both Delphi and the NYK defendants view the motion as one for summary judgment dismissing the case. Requesting dismissal pursuant to Rule 56 based on a forum selection clause is an acceptable practice, *see, e.g., Fireman's Fund McGee Marine v. M/V CAROLINE*, No. 02 Civ. 6188(DC), 2004 WL 287663 (S.D.N.Y. Feb.11, 2004); *K.K.D. Imports, Inc. v. Karl Heinz Dietrich GmbH & Co.*, 36 F.Supp.2d 200 (S.D.N.Y.1999), although such motions are more commonly brought pursuant to Rule 12. Had the NYK defendants brought their motion pursuant to Rule 12, the Court would have reached the same result: The Second Circuit has declined to adopt a particular procedural device for bringing a Rule 12 motion to dismiss based on a forum selection clause. Instead, it has

*IV. COGSA'S Per Package Liability Limitation as Applied to the Cargoes Shipped by Hanjin and NYK*

Hanjin and the NYK defendants both take the position that their liability, if any, in this case is limited by COGSA to $500 per package. Hanjin moves unconditionally for summary judgment so limiting its potential liability. The NYK defendants, on the other hand, request summary judgment on this issue only in the event that the Court finds the NYK forum selection clause unenforceable. Delphi opposes both motions and moves strike the package limitation defense raised by Hanjin and NYK on the grounds that neither the Hanjin nor NYK waybills provided a fair opportunity for Ace, the interim shipper, to declare a higher value for the cargoes. Because the Court has not ruled on the enforceability of NYK's forum selection clause, it will not address the NYK defendants' package limitation motion, *per se*, although it will consider the arguments raised therein as they pertain to Delphi's motion to strike the package limitation.

Turning first to Hanjin's motion for summary judgment, Hanjin argues that it carried the cargoes in question pursuant to a service contract that it maintained with Ace and that this contract is binding on Delphi because Ace acted as Delphi's agent in shipping the goods. According to Hanjin,

> [The service contract] was a comprehensive agreement negotiated between Hanjin (as Carrier) and Ace (as Shipper) governing all aspects of the carriage of any containerized shipment that Ace wished to book with Hanjin for ocean and/or multi-modal transport. Under the Service Contract, Ace committed to ship with Hanjin a certain minimum volume of containers and Hanjin agreed to transport the containers at the freight rates specified.

(Lee Decl. ¶ 8.) This service contract incorporates by reference the standard terms of Hanjin's bill of lading tariff, which is available to the shipper online and upon request. (Lee Decl. ¶ 10 and Ex. 1 at 24.) This tariff contains the standard terms and conditions for both Hanjin's bill of lading and sea waybill. (Lee Decl. ¶ 10.) It states that Hanjin's bill of lading is subject to COGSA where COGSA applies compulsorily and further extends the applicability of the statute "throughout the time when the Goods are in the actual or constructive custody of the Carrier." (Lee Decl., Ex. 2.) With regard to limitations on liability, the standard bill of lading provides:

> (a) Damages shall, in all events, be limited in accordance with the applicable Hague/Visby/COGSA legislation. (b) Un-

suggested that such motions invoke the district court's inherent power to decline jurisdiction and should be treated similarly to motions to dismiss for lack of personal or subject matter jurisdiction. *See New Moon Shipping Co. v. MAN B&W Diesel AG*, 121 F.3d 24, 28–29 (2d Cir.1997); *Lurie v. Norwegian Cruise Lines, Ltd.*, No. 03 Civ. 5033(PKL), 2004 WL 360435 (S.D.N.Y. Feb.26, 2004). Accordingly, additional discovery on the agency issue is also appropriate pursuant to the Court's analogous authority to deny motions to dismiss pending discovery on jurisdictional issues. *See Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir.1990) ("[G]enerally a plaintiff may be allowed limit-

ed discovery with respect to the jurisdictional issue; but until she has shown a reasonable basis for assuming jurisdiction, she is not entitled to any other discovery.") (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 & n. 13, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978)); *Turbana Corp. v. M/V Summer Meadows*, No. 03 Civ.2099(HB), 2003 WL 22852742 at *2 (S.D.N.Y. Dec.2, 2003) ("[E]ven if [plaintiff] does not satisfy its burden of establishing a *prima facie* case for jurisdiction, if [plaintiff] has shown that limited discovery would serve to fill any holes in its showing, this Court may order limited discovery, targeted at the missing jurisdictional factors. . . .").

less the nature and value of the Goods have been declared in writing by the Merchant before shipment and inserted in this Bill of Lading, and ad valorem freight regulated in the applicable tariff paid in advance; ... Where U.S. COGSA applied, the Carrier shall in no event be or become liable for any loss or damage to or in connection with the Goods in an amount exceeding U.S. dollars 500 per package, or, in case of goods not shipped in packages, per customary freight unit.

(Lee Decl., Ex. 2.) The standard terms and conditions for Hanjin's sea waybill states that the waybill is subject to the terms and conditions of the standard bill of lading and tariff and that the Hague Rules as adopted in the country of shipment, in this case COGSA, shall apply to waybills issued in lieu of bills of lading. (Lee Decl., Ex. 2.)

Hanjin argues that COGSA, and its $500 per package liability limitation, applies, *ex proprio vigore* and by contract, to the cargoes shipped under the Hanjin waybills. Hanjin further submits that the cargoes it shipped under the waybills consisted of 101 packages for the purpose of COGSA and therefore, its liability is limited to $50,500 (or $500 × 101).

Delphi does not dispute the applicability of COGSA or Hanjin's computation of the number of COGSA packages. Instead, Delphi argues that because the waybills issued by Hanjin do not *directly* reference COGSA, the package limitation and ability of the shipper to declare higher value, or provide a space for declaring higher value, Hanjin has failed to provide a fair opportunity for the shipper, in this case, Ace, to declare a higher value for the cargo and avoid the package limitation. Because the carrier must make a *prima facie* showing of such a fair opportunity in order to invoke COGSA's package limitation provi-

sion, Delphi moves to strike Hanjin's package limitation defense. In addition, Delphi argues that even if the package limitation applies to the goods shipped under the Hanjin waybills, the final determination of who is bound by the various contracts of carriage in this case should await the completion of discovery on the question of whether Ace acted as an agent for Hanjin and NYK.

Under the oft-maligned fair opportunity doctrine, "the COGSA limit is inapplicable if the shipper does not have a fair opportunity to declare higher value and pay an excess charge for additional protection." *Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing,* 167 F.3d 99, 101 (2d Cir.1999). The doctrine arose from common law principles under which a common carrier could limit its liability for a shipment only if it provided the shipper with the choice of paying a higher transportation rate based on a higher valuation of the shipment. *See* Michael F. Sturley, *The Fair Opportunity Requirement Under COGSA Section 4(5): A Case Study in the Misinterpretation of the Carriage of Goods by Sea Act,* 19 J. Mar. L. & Comm. 1, 6–18 (1988); *cf. General Elec. Co. v. MV Nedlloyd,* 817 F.2d 1022, 1028 (2d Cir.1987) ("Only by granting shippers a fair opportunity to choose between paying a greater or lesser charge to obtain corresponding more or less protection for its goods may a carrier limit its liability to an amount less than· the loss actually sustained.") (quoting *New York, New Haven & Hartford R. Co. v. Nothnagle,* 346 U.S. 128, 135, 73 S.Ct. 986, 97 L.Ed. 1500 (1953)). Despite the absence of clear language in COGSA supporting such a requirement, a number of courts, beginning with the Ninth Circuit's opinion in *Tessler Brothers (B.C.) v. Italpacific Line,* 494 F.2d 438 (9th Cir.1974), now apply the doctrine to COGSA as a "judicial encrustation" on section 4(5). *Carman*

*Tool & Abrasives, Inc. v. Evergreen Lines,* 871 F.2d 897, 900 (9th Cir.1989).

In order to meet the requirements of the doctrine in the Second Circuit, the carrier must make a *prima facie* showing that it provided the shipper with notice of the liability limitation and the means of avoiding that limitation. *General Elec. Co.,* 817 F.2d at 1029 *"Prima facie* evidence of that opportunity is established when it can be gleaned from the language contained in the bill of lading. If the carrier succeeds in demonstrating fair opportunity, the burden of proof shifts to the shipper to demonstrate that a fair opportunity did not in fact exist." *Id.* (citations omitted). Although the Second Circuit has not set a floor for what information must be included in the bill of lading to make this *prima facie* showing, it has found bills that incorporate COGSA or refer to the $500 limit and include a space for declaring excess value to be sufficient. *See Nippon Fire & Marine Ins. Co.,* 167 F.3d at 101; *General Elec. Co.,* 817 F.2d at 1029; *Binladen BSB Landscaping v. M.V. "Nedlloyd Rotterdam",* 759 F.2d 1006, 1017 n. 12 (2d Cir.1985) (Mansfield, J.).

In addressing the question of whether a carrier may invoke COGSA's per package limitation, district courts in the Southern and Eastern Districts have generally looked to whether the bill of lading incorporates COGSA, refers to COGSA's $500 limitation, and/or states that the shipper will have to declare a higher value in order to avoid the limitation. *See, e.g., MacSteel Internat'l USA Corp. v. M/V IBN Abdoun,* 154 F.Supp.2d 826, 832–33 (S.D.N.Y.2001); *Associated Metals & Minerals Corp. v. M/V OLYMPIC MENTOR,* No. 93 Civ. 4330(DLC), 1995 WL 794062, at *11 (S.D.N.Y. Dec. 20, 1995); *Union Carbide Corp. v. M/V Michele,* 764 F.Supp. 783, 786 (S.D.N.Y.1990); *E.M.S. Industrie S.A. v. Polskie Towarzystwo Okretowe,* 608 F.Supp. 1133, 1135 (E.D.N.Y.1985). Under these cases, Judge Mukasey recently observed, "at a bare minimum, a bill of lading must explicitly incorporate COGSA's provisions or refer in some way to the $500 per package limitation in order to constitute prima facie evidence of fair opportunity." *Royal Ins. Co. v. M.V. ACX RUBY,* No. 97 Civ. 3710(MBM), 1998 WL 524899 at *3 (S.D.N.Y. Aug.21 1998). On the other hand, where the liability limitation is ambiguous or where "the bill of lading requires the shipper to follow a 'circuitous' route in order to discover what set of rules establishes the liability limitation on a shipment," the shipper does not meet this burden. *See MacSteel Internat'l,* 154 F.Supp.2d at 833–34 (holding no fair opportunity where neither bill of lading, nor charter party incorporated by bill of lading, made clear that COGSA applied to the shipment in question); *Royal Ins.,* 1998 WL 524899 at *4 (finding that bill of lading subject to the "Hague Rules [or] any legislation of the Hague–Visby Rules . . . in those countries where they are in force as enacted in the country of shipment" did not provide adequate notice that COGSA governed the shipment because "a shipper who wanted to learn about his rights under the . . . Bill of Lading would have to investigate which set of rules, if either, had been adopted in the country of shipment and then determine how to avoid whatever liability limitations those rules imposed").

These previous decisions, however, all dealt with situations where the carrier issued a traditional bill of lading. Here, however, at Ace's request, Hanjin issued electronic sea waybills. A relatively new phenomena in ocean shipping, the sea waybill, unlike a traditional bill of lading, is not a document of title; it functions merely as a non-negotiable receipt that may also serve as the contract of carriage. *See*

Schoenbaum, 2 Admiralty and Mar. Law § 10–11, 63.[12] Often issued as a short form or blank back document, sea waybills provide significant advantages to the shipper and the carrier in terms of efficiency and speed because, in contrast to bills of lading, the original waybill does not need to be physically transported to its destination in order for the consignee to claim the shipment. *See id.* at 63 n. 25. Here, for example, when Ace booked shipments with Hanjin under the service contract, it faxed a description of goods and the details of the shipment to Hanjin. Hanjin, under standing instructions from Ace, then faxed the corresponding waybill back to Ace, rather than issuing traditional bills of lading that would have had to be physically transported to the shipment's destination. (Lee Decl. ¶¶ 11–14.)[13] Furthermore, in this case, the service contract, rather than the sea waybills, represented the contract of carriage between Ace and Hanjin. *See Great White Fleet (US) Ltd., v. DSCV Transport, Inc.,* No. 00 Civ. 4073(JSM), 2000 WL 1480404 at *2 (S.D.N.Y. Oct.5, 2000) ("[W]here the parties' relationship is governed by a separate contract, that contract acts as the contract of carriage and bills of lading are 'mere receipts.' "). Accordingly, under these circumstances, the question for the Court is whether the service contract gave Ace sufficient notice of the liability limitation to satisfy the fair opportunity doctrine and, more specifically, whether the Court may consider the incorporated terms and conditions of Hanjin's bill of lading in making this determination.

■■■■ The answer to this question must be *yes.* Although district courts in this Circuit have looked for an explicit reference to COGSA or the $500 package limitation in the bill of lading, they have not addressed the fair opportunity doctrine in this context: where the contract of carriage incorporates the terms of a standard form bill of lading that is on file with the Federal Maritime Commission and available both on the internet and at the offices of the carrier and its agents. Indeed, to the extent there is authority in

12. Prof. Schoenbaum offers the following concise summary of the use of sea waybills:

The requirements of intermodal carriage, shipment of goods in containers, and other technological advances have produced new types of shipping documents with different functions than traditional ocean bills of lading. An increasingly popular and useful alternative is to ship goods under a non-negotiable receipt known as a liner (sea) waybill. This is a contract for the shipment of goods (including loading and delivery by the carrier) by which the carrier undertakes to deliver the goods to the consignee named in the document. Accordingly, in contrast to the traditional bill of lading, the liner waybill is non-negotiable. The goods may be delivered to the consignee who identifies himself as such. The waybill is not a document of title, but merely conveys information. Since the physical document is no longer necessary to the transaction, the liner waybill may be transmitted electronically or telexed between the parties. As a non-negotiable bill of lading, the liner waybill is subject to the Pomerene Act and the Hague Act under American law. The Hague (or Hague/Visby) Rules are generally incorporated by a standard clause on the face of the waybill.

Schoenbaum, 2 Admiralty and Mar. Law § 10–11, 63.

13. In response to Hanjin's Local Rule 56.1 statement, Delphi claims that it has no information to confirm or deny these communications between Hanjin and Ace and requests discovery on whether Ace, in fact, gave Hanjin such instructions. However, this vague response is insufficient to create a genuine issue of fact. Furthermore, unlike its 56(f) request for discovery into the agency issue, Delphi does not have a valid reason for failing to take discovery on this issue prior to the summary judgment motion, nor has it provided a non-speculative basis for the Court to believe that Hanjin's description on this issue is incorrect.

the Circuit applicable to these circumstances, it tends to support the view that terms and conditions incorporated in the contract of carriage may satisfy the fair opportunity doctrine. For example, in *Petition of Isbrandtsen Co.*, the bill of lading for the shipment in question provided that the bill was "subject to the same rules and conditions as govern commercial shipments made on the usual forms provided therefor by the carrier." 201 F.2d 281, 283 (2d Cir.1953). Judge Augustus Hand found that language in the carrier's "usual form" bill of lading was therefore incorporated into the applicable bill of lading and provided *prima facie* evidence that the shipper had an adequate opportunity to declare a higher value for the shipment and thereby avoid the contractual application of COGSA's per package liability limitation. *Id.* at 285–86; *see also MacSteel Internat'l*, 154 F.Supp.2d at 832–33 (examining the terms of a charter party agreement allegedly incorporated in the bill of lading to determine whether fair opportunity had been shown but ultimately finding that the terms of the charter party did not clearly express that COGSA applied).

This comports with the majority rule that incorporated terms and conditions may satisfy the requirement that a carrier provide the shipper notice and a fair opportunity to declare higher value and avoid COGSA's liability limitation. *See* Schoenbaum, 2 Admiralty and Mar. Law § 10–35, 166 ("According to the majority view the fair opportunity requirement is satisfied when a bill refers to a bill of lading and tariff on file with the Federal Maritime Commission."); *see also Cincinnati Milacron, Ltd. v. M/V American Legend*, 804 F.2d 837 (4th Cir.1986) (per curiam) (sitting en banc, reversing earlier panel decision holding that fair opportunity doctrine could not be met through terms incorporated in a short form bill of lading; cited, although on another point, in *General Elec.*

*Co.*, 817 F.2d at 1029). Finally, even the Ninth Circuit, which applies the most stringent approach to the fair opportunity doctrine, has found that actual possession of the applicable bill of lading is not necessary to impart notice to the shipper of its terms where the bill is readily available to the shipper. *See Royal Ins. Co. v. Sea–Land Service, Inc.*, 50 F.3d 723, 727–29 (9th Cir.1995) (citing cases); *cf. Sea–Land Service Inc. v. Lozen Internat'l, LLC*, 285 F.3d 808, 814–15 (9th Cir.2002) (finding that where shipment was transported under electronic sea waybills, terms of non-electronic bills of lading controlled the parties' agreement). It would be illogical to apply a different rule where, as here, it is the *shipper* who has requested a sea waybill rather than the long form bill of lading. *Cf. Jockey Internat'l, Inc. v. M/V "Leverkusen Express"*, 217 F.Supp.2d 447, 454 (S.D.N.Y.2002) (Haight, J.) ("The primary purpose of issuing [an electronic waybill] is for the shipper's convenience, so that the consignee need not await receipt of a paper bill of lading before collecting its cargo at disembarkment. Because an [electronic waybill] is not meant to be issued in paper form, it would be illogical and unfair to penalize [the carrier] for not maintaining a contemporaneous printout of a document that in shipping practice is not intended to be viewed except on a computer screen.... Because [shipper] specifically requested the [electronic waybill], it cannot now complain that it was not issued a paper printout of the same or that it had no notice of the bill of lading's terms and conditions.").

The terms and conditions of the bill of lading applicable to the cargoes shipped under the Ace/Hanjin service contract unquestionably meets the fair opportunity test. In order to view these terms, Ace merely had to visit Hanjin's web site, request a copy of long form bill from Han-

jin's offices, or, indeed, change its standing request to ship the cargoes under sea waybills. In short, the application of COGSA's package limitation to the shipments in question is unambiguous and the route to the relevant terms and conditions in Hanjin's long-form bill of lading is clear and straight. Under the circumstances, it would be an absurd result to find that Ace lacked a fair opportunity to declare a higher value and pay a correspondingly higher transportation rate. Because Delphi has offered no evidence to rebut Hanjin's *prima facie* showing, the Court denies Delphi's motion to strike Hanjin's package limitation defense and grant's Hanjin's motion for summary judgment insofar as it seeks a ruling that COGSA's liability limitation provisions apply to the contract of carriage between Ace and Hanjin.

The Court is unable to grant Hanjin's motion in full, however, because of the unresolved agency issue discussed in the previous section. If Ace acted as an agent for Hanjin and NYK as stated in the Ace bills, Hanjin and NYK would be bound by the terms of those bills, including the higher liability amounts which may apply. In addition, such a relationship would undermine Hanjin's justification for binding Delphi to the terms of the contract of carriage between Ace, an NVOCC, and Hanjin, a carrier, based on the presumption that an NVOCC acts as the agent for the shipper. *See, e.g., Glyphics Media, Inc. v. M.V. CONTI SINGAPORE,* No. 02 Civ. 4398(NRB), 2003 WL 1484145 at *7 (S.D.N.Y.2003); *Orion Ins. Co. v. M/V Humacao,* 851 F.Supp. 575, 578 (S.D.N.Y. 1994). The Court therefore denies Hanjin's motion for summary judgment insofar as it seeks to limit its liability to Delphi pending the outcome of discovery on the agency issue. As the Court indicated earlier, upon the expeditious completion of this discovery, if no genuine issue has been raised upsetting the presumption that Ace, in fact, acted as Delphi's agent, Hanjin may file a renewed motion for summary judgment limiting its liability to plaintiff, which will be addressed in short order.

Turning lastly to Delphi's motion to strike NYK's package limitation defense, the foregoing analysis leads to the same conclusion. At Ace's request, NYK provided sea waybills instead of traditional bills of lading for the shipments it carried. Because there was no service contract between Ace and NYK, the sea waybills themselves constitute the contract of carriage for these shipments; however, as opposed to the blank back waybills issued by Hanjin, the NYK waybills explicitly incorporate what are known as the "CMI Uniform Rules for Sea Waybills" as well as NYK's applicable bill of lading and tariff. Delphi does not contest that the language contained in these incorporated documents gave Ace adequate notice of COGSA's package limitation and the opportunity to declare a higher value; rather, it argues that the fair opportunity requirement may only be satisfied by language actually included in the NYK waybill. The Court finds that where a shipper has requested sea waybills in lieu of a traditional paper bill of lading and where those waybills explicitly incorporate the carrier's standard bill of lading, which is readily available to the shipper, the fair opportunity doctrine may be satisfied by language contained in that bill of lading. Accordingly, Delphi's motion to strike NYK's package limitation defense is denied.[14]

---

14. For the sake of completeness, the Court notes that it rejects the novel argument raised by NYK and endorsed by Hanjin that the fair opportunity doctrine does not apply where a shipment is covered by a service contract. NYK raises the argument for the first time in its opposition to Delphi's motion and submits a service contract between NYK and Daewoo,

## CONCLUSION

For the foregoing reasons, the parties respective motions are resolved as follows: 1) Ace's motion to limit its potential liability to $500 per package is granted as to the 20 Ace bills of lading where no value for the cargo is declared and denied as to the 71 bills where the cargo's value is included in the description of the goods. Ace's motion to extend its liability limitation to additional parties under the Himalaya clause in its bills of lading is denied on the present record. 2) NYK's motion to dismiss based on the forum selection clause in its standard bill of lading is denied pending adequate discovery on the issue of whether Ace acted as an agent for NYK and Hanjin. 3) Hanjin's motion for summary judgment is granted insofar as it seeks a ruling that COGSA's $500 per package liability limitation incorporated in the contract of carriage between Ace and Hanjin is valid and enforceable but denied insofar as it seeks to limit its liability to plaintiff pending discovery on the agency issue. 4) Delphi's motion to strike the package limitation defense of Hanjin and NYK is denied. The parties are directed to appear before the Court for a status conference on June 10 at 11:30 a.m.

**SO ORDERED.**

which it claims applies to the shipments between Ace and Delphi. Because Ace took advantage of the negotiated rates established in the NYK/Daewoo service contract, NYK argues, the relationship between NYK and Ace is one of private carriage and therefore not subject to the rules for common carriage, including the fair opportunity doctrine.

Leaving aside the issue of the extent to which the NYK/Daewoo service contract governs the relationship between Ace and NYK, there is little indication that a service contract renders the carrier a "private" carrier for the goods shipped thereunder. First, under established common law principles, "a carrier could not put off its common-carrier status by mere contractual provision." *Akron, Canton & Youngstown RR Co. v. I.C.C.,* 611 F.2d 1162, 1167 (6th Cir.1979); *see also Isbrandtsen,* 201 F.2d at 285 (applying the fair opportunity doctrine even though the freight contract had been "separately negotiated"). Second, the U.S. Shipping Act, which allows common carriers to enter into service contracts offering negotiated rates and specific "service features," does not suggest that entering into such a contract absolves the carrier of its other common law duties or renders it a private carrier. 46 U.S.C.App. §§ 1702(19), 1707(c). Finally, although rooted in common law principles, courts typically apply the fair opportunity doctrine as a requirement of COGSA itself, *see, e.g., MacSteel Internat'l,* 154 F.Supp.2d at 832, applicable whenever the carrier invokes COGSA's liability limitation provision without regard to the existence of a service contract between the parties, *see, e.g., Royal Ins.,* 50 F.3d at 726. In any event, the Court is not inclined to adopt such an argument based on the casual treatment it was given in defendants' briefs.